Ginette K. HORTON, Appellant,

v.

MONTGOMERY WARD & CO., INC., Appellee.

No. 04–91–00060–CV.

Court of Appeals of Texas, San Antonio.

Jan. 8, 1992.

Rehearing Denied Feb. 18, 1992.

Harry J. Skeins, Jr., Skeins & William-
son, San Antonio, for appellant.

Dennis P. Duffy, George P. Parker, Jr.,
John A. Ferguson, Jr., Matthews & Bran-
scomb, San Antonio, for appellee.

Before BUTTS, CHAPA and BIERY, JJ.

OPINION

BIERY, Justice.

Ginette K. Horton, appellant/plaintiff, sued Montgomery Ward & Co., Inc. for $1,000,000, alleging mental anguish because a fellow employee, James Lancaster, threw a paper wad at her. The trial court granted Montgomery Ward's motion for summary judgment. We affirm.

In 1975, Ms. Horton began working for Montgomery Ward as a secretary in the Product Services Unit in San Antonio, Texas. In September of 1987, she was promoted to the managerial position of Operations Supervisor. A co-worker in the Product Services Unit, James Lancaster, was also classified as a supervisor with the same level of authority as Ms. Horton. About a week after her promotion, Ms. Horton entered Mr. Lancaster's office to discuss a customer complaint. Ms. Horton stated she had been instructed by Howard Ward, the Product Service Manager, to request Lancaster's assistance with this particular customer. A discussion between Horton and Lancaster ensued during which Horton wanted to give Mr. Lancaster a note, written on a four-inch by six-inch piece of paper, she had prepared concerning the customer's complaint. Lancaster responded that the complaint was not his problem and shook his finger at Horton saying, "get out of [my] office dummy." Although Lancaster made it clear he did not want Horton to leave the note with him, she placed it on his desk and returned to her office. Moments later, Lancaster walked into her office, wadded up the complaint note, and tossed the note at Horton stating, "Don't dump your shit on me." The note allegedly hit Horton on the arm and landed on her desk.[1] Horton then responded she would handle the complaint to which Lancaster replied, "Good." Ms. Horton also stated she has not spoken to Lancaster since the incident. The record is clear that there were problems between Lancaster and Horton. This appeal, however, is limited to the employer's (Montgomery Ward) intent to injure Horton.

Ms. Horton initially filed suit in December of 1987. After her first suit was dismissed, for Horton's failure to appear for the continuation of her deposition, Horton refiled her cause of action by filing a second amended original petition. A motion for summary judgment, directed at the allegations in Horton's second original petition, was filed by Montgomery Ward.[2] Horton filed a response to Montgomery Ward's motion and on the same date, filed her third amended petition in which she dropped one of the named defendants,[3] dropped her slander allegation, and added allegations of intentional infliction of emotional distress, breach of contract, and misrepresentation. The court denied Montgomery Ward's first motion for summary judgment which was "directed to Plaintiff's Second Amended Original Petition" only. Approximately one year later, Montgomery Ward filed its second motion for summary judgment which was granted. Horton then filed a motion for nonsuit, dismissing Lancaster as a defendant. After the court entered its final judgment, Montgomery Ward filed its motion for attorney's fees and sanctions pursuant to Rule 13, Texas Rules of Civil Procedure. The court agreed with Montgomery Ward that two of Horton's claims were frivolous but stated it would not impose sanctions if Horton were to drop the offending claims from the complaint. Horton did file a fourth amended original petition which omitted the two friv-

---

1. Horton testified in her deposition that she did not try to move out of the path of the oncoming paper wad because she did not think it would hit her.

2. The allegations were that Lancaster harassed and humiliated her, cursed at her, and committed assault and battery against her by hurling his arms at her as if to hit her and by actually striking her with a wadded up piece of paper, without her consent; that Montgomery Ward was negligent in the hiring of Lancaster; that Montgomery Ward was grossly negligent because it was consciously indifferent to the rights and welfare of Horton. Horton also alleged a cause of action for slander.

3. Defendant Howard Ward was added in Horton's second amended original petition but was dropped as a defendant in Horton's third amended petition. The remaining defendants were Montgomery Ward and James Lancaster.

olous claims.[4] Horton asserts two points of error in which she contends the court erred in granting the summary judgment and in forcing her to amend her petition.

In her first point of error, Horton contends the court erred in granting Montgomery Ward's summary judgment and final judgment. In order to obtain a summary judgment, each element of the defense must be proved conclusively by the defendant or at least one element of each of plaintiff's claims must be negated. *Overstreet v. Home Indem. Co.*, 678 S.W.2d 916 (Tex.1984). Once a defendant has negated the elements as a matter of law, plaintiff then has the burden of introducing evidence which raises issues of fact with respect to the elements negated by the defendant's summary judgment evidence. *Eckler v. General Council of the Assemblies of God*, 784 S.W.2d 935, 938 (Tex.App.—San Antonio 1990, writ denied). When an affirmative defense is established by the movant as a matter of law, the burden is placed on the nonmovant to adduce evidence raising a fact issue if the nonmovant wishes to defeat the affirmative defense and avoid the summary judgment. *"Moore" Burger, Inc. v. Phillips Petroleum Co.*, 492 S.W.2d 934, 936–37 (Tex.1972); *Yzaguirre v. Medrano*, 786 S.W.2d 88, 90 (Tex.App.—San Antonio 1990, no writ). The standard for reviewing a motion for summary judgment is as follows:

1. The movant for summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.
2. In deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the nonmovant will be taken as true.
3. Every reasonable inference must be indulged in favor of the nonmovant and any doubts resolved in its favor.

*Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548–49 (Tex.1985); *Elam*

*v. Yale Clinic*, 783 S.W.2d 638, 641 (Tex. App.—Houston [14th Dist.] 1989, no writ).

In its motion for summary judgment, Montgomery Ward made the following assertions: (1) that Horton's claims arising out of the alleged assault and battery were barred by the exclusivity provisions of the Texas Workers' Compensation Act, and that none of the alleged acts or omissions which produced the alleged injury rose to the level of an intentional act by Montgomery Ward; (2) that Horton's claims for intentional infliction of emotional distress for acts occurring since the assault were barred because Montgomery Ward's alleged wrongful conduct was not "extreme and outrageous" as a matter of law, and that these claims were also barred by the exclusivity provisions of the Texas Workers' Compensation Act; (3) that Horton failed to establish a cause of action for breach of an alleged oral or implied employment contract because it was undisputed that Horton was an "at-will" employee, and the employment manual and other employment policies of Montgomery Ward did not constitute an enforceable employment contract as a matter of law; that Horton expressly acknowledged in writing her at-will status, and Montgomery Ward's personnel policies, upon which Horton relies, specifically disclaim any contract rights and preserve Montgomery Ward's right to change employment conditions at will; and (4) that Horton failed to establish a cause of action for intentional misrepresentation because she failed to identify any facts showing intentional misrepresentation by Montgomery Ward, and the personnel policies allowed Montgomery Ward to change employment conditions with or without notice to the plaintiff.

The Texas Workers' Compensation Act provides the exclusive remedy for injuries sustained by employees in the course of their employment and exempts employers from common law liability claims based on negligence or gross negligence except in death cases. *Castleberry*

---

**4.** The court found that Horton's claims for breach of contract and misrepresentation were frivolous.

*v. Goolsby Bldg. Corp.*, 617 S.W.2d 665, 666 (Tex.1981). The Act does not, however, exempt employers from common law liability for intentional injuries. *Id.* Direct assaults by an employer on the employee fall within the intentional injury exception. *Reed Tool Co. v. Copelin*, 689 S.W.2d 404, 406 (Tex.1985). The primary difference between a negligent or grossly negligent injury and an intentional injury is the specific intent to inflict the injury. *Id.* "The Restatement of Torts defines intent to mean that 'the actor desires to cause the consequences of his act, or that he believes that the consequences are substantially certain to result from it.'" *Id.* The court in *Reed* held that the intentional failure to furnish a safe place to work does not rise to the level of an intentional injury except when the employer believes his conduct is substantially certain to cause the injury. *Id.* at 407. Gross negligence, on the other hand, is established if it is shown that the actor knew the conduct posed substantial risk to others but acted with conscious indifference to the rights, welfare, and safety of the others. *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 920 (Tex.1981). What lifts ordinary negligence into gross negligence is the mental attitude of the defendant. *Id.* at 922. To be classified as gross negligence, it must be shown that the actor knew about the peril but "his acts or omissions demonstrated that he didn't care. Such conduct can be active or passive in nature." *Id.*

██ A review of the summary judgment evidence indicates that Horton admitted in her deposition testimony that the paper wad "assault" occurred in the course and scope of a work-related argument.[5] She stated that as a result of the incident, she started having severe headaches and experiencing tension in her neck. An injury similar to the one alleged by Horton has been found to be compensable under the Workers' Compensation Act. *See Director, State Employees Workers' Compensation Div. v. Camarata*, 768 S.W.2d 427, 429 (Tex.App.—El Paso 1989, no writ) (mental trauma may produce accidental injury as long as proof of definite time, place, and cause exists). Horton admits, however, that she has no evidence that Montgomery Ward requested or otherwise directed Lancaster to assault her. Evidence of such a request or direction has been held to fall within the narrow exception to the Workers' Compensation Act. *Richardson v. The Fair, Inc.*, 124 S.W.2d 885, 886 (Tex.Civ.App.—Beaumont 1939, writ dism'd judgmt cor.). The court in *Richardson* allowed the employee to recover because the employer hired the appellee for the express purpose of assaulting the employee, but the court went on to state that "if an employee is injured while in the course of his employment by an unprovoked assault on his person inflicted by a co-employee, the employee is entitled to compensation under the Texas Workmen's Compensation Act." *Id.* We also recognize that an injured person's lack of awareness of another's intent to injure him does not by itself establish a non-existent intent as a matter of law. *Rodriguez v. Naylor Indus.*, 763 S.W.2d 411, 413 (Tex.1989). Here, the evidence presented does not raise even a fact question as to any intent on the part of Montgomery Ward to injure Ms. Horton.

In support of her intent claim, Horton not only relies on her own affidavit and the affidavits of four other Montgomery Ward

---

5. Horton's deposition testimony was as follows:
 Q: The argument that ensued between yourself and Mr. Lancaster on September 22, 1987, at approximately 10:50 a.m. related to some work-related business; isn't that correct?
 A: Yes, sir.
 Q: The note, in fact, was a note relating to a customer that had to be serviced by either Mr. Lancaster or someone on behalf of Montgomery Ward & Company; is that true?
 A: Yes, that's true.
 Q: Was there anything to the discussion between yourself and Mr. Lancaster from 10:50 in the morning until you left for lunch that day on September 22, 1987? Is there anything that was being done between the two of you that was related to some personal dispute that the two of you had?
 A: Personal dispute?
 Q: As opposed to any business of Montgomery Ward & Company, namely, this customer, for example, or taking messages for customer work?
 A: No, sir, not that I am aware of.

employees, but also on the deposition testimony of Howard Ward. Mr. Ward, Montgomery Ward's Product Service Department manager, admitted having behavior problems with Lancaster but stated that Lancaster would be counseled and at times, reports were placed in his personnel file. Ms. Horton asserts that because of Montgomery Ward's knowledge of these behavior problems, Montgomery Ward knew with substantial certainty that she would be injured by Mr. Lancaster. While there is no doubt that Horton and the four other present and former Montgomery Ward employees claim that Lancaster yelled at them, intimidated them, used abusive language, and harassed them, there is no evidence which raises a fact question as to whether Montgomery Ward directed Lancaster's actions and intended to harm Horton or that Montgomery Ward knew with substantial certainty that she would be harmed. The affidavits by the other employees indicate that they had encounters with Lancaster, that Lancaster was not reprimanded as much as they would have liked, and that it was the affiant's opinion that Lancaster was used to harass and intimidate employees. The evidence may raise a fact question as to whether Montgomery Ward may have been grossly negligent in failing to reprimand Lancaster for his antics and in supervising his behavior, but "[a]n injury caused by willful negligence or willful gross negligence is not an intentional injury necessary to avoid the effect of the Workers' Compensation Act." *Castleberry,* 617 S.W.2d at 666.

■ Horton's next assertion is that summary judgment should not have been granted as to her claim for intentional infliction of emotional distress. The elements to prove this cause of action are: (1) Montgomery Ward acted intentionally or recklessly; (2) the conduct was extreme and outrageous; (3) the actions of Montgomery Ward caused plaintiff emotional distress; and (4) the emotional distress suffered by Horton was severe. *Tidelands Auto. Club v. Walters,* 699 S.W.2d 939, 942 (Tex.App.—Beaumont 1985, writ ref'd n.r.e.). Ms. Horton cites nine instances in her affidavit which she contends rises to the level of extreme and outrageous conduct:

1. Montgomery Ward assaulted her and committed battery upon her on September 22, 1987.

2. Montgomery Ward frightened her and humiliated her by placing rattlesnake rattlers on her desk.[6]

3. Montgomery Ward continued to promote name calling against her for almost two years after the September 22, 1987, incident.

4. Montgomery Ward caused her personal property to be pilfered and vandalized.

5. Montgomery Ward caused other employees to ostracize her from a normal business relationship with them.

6. Montgomery Ward defamed her by mutilating her photographs that were displayed on a bulletin board along with the photos of other employees (the eyes were scratched out).

7. Montgomery Ward purposely directed her to order Lancaster to repair a customer's air conditioner, knowing that the direction would result in harm to her (this order was given to

---

6. Ms. Horton's memorandum concerning this incident read in part:

On Monday morning (April 4, 1988) at approximately 7:50 A.M., I arrived at work at the Product Service Department—San Antonio, Texas. As usual, I went directly to my office, unlocked the door, and walked in; I walked around to the backside of my desk and pulled out my chair to sit down; as I went to place my purse on the floor beside my desk, I jumped back with fright when I saw this strange looking object (rattlesnake ratt-

lers) only inches from my face! I took a pencil from my desk and moved the object around and discovered that it was a set of 'rattlesnake rattlers'. Strangely enough, the first thing that went through my mind was that this was almost like some of the things that happened to Charlie Edwards several years ago; certain individuals played 'jokes' and 'pranks' on him until they drove him to retirement. I'm very thankful that the rattlesnake wasn't attached to this set of rattlers!

her after the September 22, 1987, incident).[7]

7. Ms. Horton explains this incident in a memorandum to Mr. Howard Ward which is dated July 11, 1988, and reads in part as follows:

Before 11:00 A.M.—Friday—July 8, 1988, I received a Corporate complaint call from Kathy Baretta from the Chicago office. She seemed very concerned because a customer ... had just contacted Mr. Brennan regarding his central air conditioning unit.... [The customer] stated that Montgomery Ward Service Department had been to their house on six (6) service calls since March of this year and that their central air unit was out again. Kathy Baretta asked me who 'Lancaster' was and I informed her that Mr. Jim Lancaster was also another Technical Supervisor; Kathy Baretta herself told me that Mr. Jim Lancaster has an 'ATTITUDE PROBLEM' because he had told the customer that he didn't care who they ... called concerning his A/C problem—consequently [the customer] called the Corporate Office in Chicago and talked with Mr. Brennan himself....

Shortly after I had returned from lunch, Mr. Ron Lager called me concerning this Corporate complaint from Chicago regarding the [customer's] air conditioning problem. I informed Mr. Lager as to the conversation with Kathy Baretta and myself and also informed him as to the details as to whom was being dispatched to the [customer's] residence to work on and repair the a/c unit. I also explained to Mr. Lager that the [customer's] air conditioning unit was over nineteen (19) years old and that the unit was still under our service contract. Mr. Lager asked me to 'flag' the file N/S and also asked me to get involved, even if it meant *me* sending Jim Lancaster to the customers residence with the technician or contacting another company to repair the a/c unit; Mr. Lager further stated that Mr. Brennan's office had already received two (2) calls from the customer!
....

In my opinion, this Corporate complaint involving Mr. Brennan as well as Mr. Lager was unnecessary and most definitely could have been prevented. Perhaps only 'some' people are *not* required to practice 'Focus On The Customer' and this *AGAIN* clearly proven by Mr. Lancaster by his leaving work early that day at 3:30 P.M. and once again leaving his 'work' and 'complaining customer' to be cared for and handled by one of his associates....
I do *not* understand why Mr. Lager as well as Kathy Baretta from the Chicago office called and requested that I check into this customer's Corporate complaint regarding the [customer's] air conditioning problem. Do we have or Do we *NOT* have a capable Technical Supervisor over the Air Conditioning and Refrigeration Department who could have and most definitely should have handled this problem?; Evidently *NOT!* AGAIN, Mr. Lan-

8. Montgomery Ward wrongfully disciplined her for reporting incidents that she was duty bound to report.[8]

caster has shown a 'total' disregard for the customer's feelings and can be easily verified by [the customer] and also through Kathy Baretta in Mr. Brennan's Corporate Office in Chicago!
I most certainly do *not* understand Mr. Lager's comment to me that 'if need be, he wanted me to send Mr. Lancaster to the [customer's] residence with the technician to repair the a/c unit'; Not only do I *not* understand Mr. Lager's request that would place me in a very uncomfortable situation but I sincerely do *not* appreciate Mr. Lager's request in the least.

8. The written reprimand read as follows:

For the past several months (3–17–88, 4–4–88, 4–6–88, 6–16–88, 7–11–88) you have written a number of memos complaining about alleged misconduct and poor job related attitude on the part of Jim Lancaster. Your most recent complaint is also directed at me and Ron Lager. We have investigated your various allegations and found them to be unsubstantiated or petty and exaggerated in nature, and in some instances (for example, Jim's 'gum popping' and alleged refusal to go to Corpus Christi) not even matters of legitimate concern to you as operation supervisor. In two instances, you even refused to cooperate by providing information to assist us in investigating your complaints. For example, you refused to give any cooperation to Rick Ricken in his attempt to investigate the very serious allegation contained in your memo of April 6, 1988. I can only conclude that your motives are not to provide constructive criticism or lodge legitimate complaints, but instead are a vindictive attempt, for whatever reason you may have, to attack and discredit Jim Lancaster. You seem to take pleasure in reporting any unsubstantiated rumor about Jim so that you can support your own conclusions and criticisms of his performance and then disseminating your unsubstantiated report to hightest [sic] levels of Montgomery Ward management. As an example from your latest memo dated 7–11–88 regarding a corporate complaint from Mr. Jonas, you stated that 'you had heard' that Mr. Lancaster had hung up on Mr. Jonas, and also that Mr. Jonas had talked to Mr. Brennan himself. For your information, in my conversation with Mr. Jonas on July 11, 1988, Mr. Jonas stated to me that he had hung up on Jim and had called the corporate office and had talked to one of Mr. Brennan's assistants.
You also related your feelings that 'my lengthy talk with Mr. Lancaster in Byford's office' on June 24, 1988, 'did a tremendous amount of good', which was sarcastic and not a constructive comment. You also ques-

9. Montgomery Ward damaged her personal property located in her office.

In addition, in her answers to interrogatories she responded that she based her intentional infliction claim upon the following events:

1. Horton's supervisor refused to discipline Lancaster regarding the paper wad incident.

2. Howard Ward called Horton into his office and reprimanded her for telling her husband about the paper wad incident, and Ward told her husband that whatever happened to Horton while she was at work was none of his business.

3. Ron Lager, a manager in Montgomery Ward's Houston office, promised Horton that there would be a complete and thorough investigation into the paper wad incident, but he appointed Howard Ward to investigate the situation that Horton believed Mr. Ward created.

4. On July 8, 1988, Mr. Lager called Horton from his Houston office and ordered her to "get involved" in taking care of a customer complaint, even if it meant her sending Mr. Lancaster to the customer's residence to fix the customer's air conditioner.

5. Mr. Ward failed to advise her on what action she should take regarding incidents in which an employee she supervised failed to wear his uniform to work, took a company truck home without previous approval, and referred to Horton as a "fucking bitch" on one occasion to another supervisor, Mr. Byford.

6. Rick Ricken, a manager in the Chicago corporate office, failed to take prompt action regarding her complaint concerning Mr. Ward and Mr. Lancaster.

7. Howard Ward made the comment that as soon as this lawsuit was over with, she would be gone (meaning "fired").

8. Howard Ward failed to take appropriate action against Jim Lancaster for Lancaster's "unprofessional conduct" toward her.

9. On April 4, 1988, Lancaster and Richard Byford, Horton's coworkers, refused to assist a fellow employee, Dan Velasquez, who needed their help as a supervisor, which allegedly caused her workload to increase.

10. A few days before April 6, 1988, a fellow employee told Horton that Lancaster had given her the nickname of "rattlesnake."

11. On April 6, 1988, Horton discovered a set of rattlesnake rattlers on her desk.

12. On various other occasions, Horton observed that pictures of her children and of her husband were turned face down or were turned facing the wall of her office, that glass on a picture frame was broken, and that pictures of herself, along with other associates that were displayed in the hallway, had her eyes scratched out and moustaches drawn on her mouth.

Montgomery Ward contends that none of Horton's claims rise to the level of extreme and outrageous conduct as a matter of law. Montgomery Ward asserts that these inci-

tioned why Cathy Baretta—or Ron Lager—would call you to check into corporate complaints on an air conditioner. It is proper for the corporate office to contact the Operations Supervisor or any other available supervisor to assist in the prompt resolution of a customer complaint.

We consder [sic] your conduct to be unbusinesslike conduct as defined in our progressive discipline procedure. Your conduct has been both disruptive to the team spirit that must exist in the Product Service Center and coun-

terproductive to officiate operations. Montgomery Ward will not tolerate continued conduct of this nature in the form of petty criticism, circulation of unfounded rumors, refusal to cooperate with management, or interjection of yourself into matters that are not properly part of your supervisory responsibilities or in which you are not directly involved and do not have a legitimate interest. If future incidents of this nature do occur, it will result in futher [sic] discipline, including possible termination.

dents show nothing more than petty conflicts between Horton and her coworkers, in particular James Lancaster, and Horton's belief that management was indifferent as to her complaints or inept in its handling of the situations. In addition, Montgomery Ward claims that Horton's claim is barred by the exclusivity provisions of the Texas Workers' Compensation Act because her claim arose from incidents committed by Montgomery Ward's employees at work and during the course and scope of Horton's employment.

Liability for outrageous conduct has been found "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case in which outrageous conduct is found is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" RESTATEMENT (SECOND) OF TORTS Section 46, Comment d (1965). The Restatement further explains that liability does not extend to "mere insults, indignities, threats, annoyances, petty oppression, or other trivialities." *Id.* It is also recognized that the "rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind." *Id.* "There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam." *Id.* It is for the court to first determine whether the conduct may reasonably be regarded as so extreme and outrageous as to allow recovery. *Id.* at Comment h.

Incidents in which a Texas court has determined the conduct to be extreme and outrageous in the employer/employee setting are few. In *Dean v. Ford Motor Credit Co.*, 885 F.2d 300, 308 (5th Cir.1989), the attempt by the employer to set up a totally innocent employee as a target for a criminal charge simply because she opposed an illegal employment practice was found to be an intentional infliction of emotional distress. The Fifth Circuit made it clear that "fact that the 'check incidents' occurred (the placing of checks in the employee's purse in order to make it appear she was a thief or putting her in fear of criminal charges for theft) and that the defendant was responsible for them is precisely what takes this case beyond the realm of an ordinary employment dispute and into the realm of an outrageous one. Such conduct simply will not be tolerated." *Id.* at 307. Had it not been for the check incidents, the other conduct, not considering the employee for a position she was qualified for, transferring her from desk to desk, calling upon the employee to do more work, subjecting her to unfair harassment, and subjecting her to special reviews not given to the other employees, would not have been outrageous.

Another Texas case in which the employee recovered for intentional infliction of emotional distress was *Bushell v. Dean*, 781 S.W.2d 652 (Tex.App.—Austin 1989), *rev'd on other grounds and writ denied*, 803 S.W.2d 711 (Tex.1991). In *Bushell*, the employee claimed that she was sexually harassed for approximately four months by her supervisor, and the supervisor denied only a few of the employee's statements depicting his conduct. The conduct consisted of buying small things for the employee, calling her "My Sweet Mary", telling her he liked her slit skirt, remarking about the shape of her body, telling her on several occasions that he loved her and desired a sexual encounter, and becoming more demanding after she publicly spurned him and expecting her to complete her duties more quickly and thoroughly. The jury agreed with the employee that the events were humiliating and embarrassing. *Id.* at 658.

The record in this case indicates that the conflicts between Horton and Lancaster arose after the paper wad incident and

were nothing more than an exchange of insults, indignities, annoyances, and other trivialities which, as a matter of law, do not rise to a level of extreme and outrageous conduct. It is also possible that Horton's cause of action is barred by the Workers' Compensation Act because "[w]hen the person who intentionally injures the employee is not the employer in person nor a person who is realistically the alter ego of the corporation, but merely a foreman, supervisor or manager, both the legal and moral reasons for permitting a commonlaw suit against the employer collapse, and a substantial majority of modern cases bar a damage suit against the employer." A. LARSON, THE LAW OF WORKMEN'S COMPENSATION § 68.21 (1990). Here, Lancaster and Horton were on the same management level; Lancaster was not Horton's supervisor, much less an alter ego of the corporation.

Horton's next contention is that Montgomery Ward breached its oral employment contract with her by failing to provide her with a safe working environment pursuant to TEX.REV.CIV.STAT.ANN. art. 5182a, § 3 (Vernon 1987). Horton asserts in her affidavit that she had an oral employment contract with Montgomery Ward, and that she realized, in 1987, that Montgomery Ward had violated its legal duty to provide her with a safe place to work because Montgomery Ward knew that Jim Lancaster had assaulted, abused, intimidated, and terrorized other employees over a period of years. Knowing this, Montgomery Ward exposed her to Lancaster's abuse and failed to warn her of the danger involved in talking with him or making any contact with him. In her opinion, Montgomery Ward failed to provide her with a safe place to work and this failure constituted a breach of her employment contract.

 A review of the record indicates that Horton was an at-will employee as evidenced by the following statement she signed upon receiving her employment manual:

I have read and fully understand the rules governing my employment with Montgomery Ward. I agree that I will conform to these rules and regulations and, further understand and agree that my employment is for no definite period and may, regardless of the time and manner of payment of my wages and salary, be terminated at any time by Montgomery Ward or me, with or without cause, and without any previous notice.

Under Texas law, an employee handbook does not constitute an employment contract and may not impose contractual restrictions on an employer absent agreement between the employer and employee. *Benoit v. Polysar Gulf Coast, Inc.,* 728 S.W.2d 403, 406 (Tex.App.—Beaumont 1987, writ ref'd n.r.e.). The Montgomery Ward personnel handbook and manager's guide, relating to the disciplinary program, clearly state that it does not represent a contract of employment and employment with Montgomery Ward could be terminated at will for any reason, with or without cause.

 Horton also asserts that she had a right to be provided with a safe working environment pursuant to statute. Section 3 of the article 5182a provides:

Every employer shall furnish and maintain employment and a place of employment which shall be reasonably safe and healthful for employees. Every employer shall install, maintain, and use such methods, processes, devices, and safeguards, including methods of sanitation and hygiene, as are reasonably necessary to protect the life, health, and safety of such employees, and shall do every other thing reasonably necessary to render safe such employment and place of employment.

TEX.REV.CIV.STAT.ANN. art. 5182a, § 3 (Vernon 1987). The duty of an employer to provide a safe place to work has been confined to the construction, physical condition, and equipment of the premises, and not with regard to acts of fellow employees. *Gonzales v. Lubbock State School,* 487 S.W.2d 815, 817 (Tex.Civ.App.—Amarillo 1972, no writ). We do not read the

above statute to pertain to acts by fellow employees.

In her fourth cause of action, Horton claims that Montgomery Ward "through its contract of employment with [Horton] and through its disciplinary policies applicable to its employees, including Plaintiff, intentionally misrepresented material facts or failed to disclose material facts, knew them to be false when they were made and continued in the course of her employment, and intended Plaintiff to rely upon the representations." In her affidavit, filed in response to Montgomery Ward's motion for summary judgment, Horton claims that she was specifically told she could expect the following:

1. To enjoy a safe working environment;
2. Could expect uniform and corrective actions in the event disciplinary actions became necessary;
3. Montgomery Ward would investigate, evaluate, and report misconduct and administer discipline fairly, appropriately, and properly;
4. Montgomery Ward would try to correct disciplinary problems in good faith;
5. Montgomery Ward would not avoid enforcement of its announced and printed disciplinary policies;
6. Montgomery Ward would conduct its investigations of misconduct fairly and objectively;
7. Montgomery Ward would not tolerate sexual harassment; and
8. Montgomery Ward would not tolerate offensive and degrading remarks cast upon employees or physical abuse of employees.

When Montgomery Ward asked Horton, by way of interrogatories, the facts which supported her misrepresentation claim she responded that Montgomery Ward knew that Lancaster did not conduct himself in a professional manner, that Lancaster yelled at fellow associates, that Lancaster had never once before been placed on report prior to the paper wad incident, that Lancaster had assaulted another employee years before the paper wad incident, that despite Mont-

gomery Ward's knowledge of slanderous and derogatory remarks made by Lancaster about fellow associates, Lancaster still does as he wishes, that Montgomery Ward commented that as soon as the lawsuit was over Horton would be gone, Horton was reprimanded for telling her husband about the paper wad incident, when Horton called Ron Lager about the incident, he appointed Howard Ward to investigate and Mr. Ward downplayed the incident, and Horton was told to send Lancaster to a customer's residence after the paper wad incident.

■ To establish a claim for intentional misrepresentation there must be evidence that (1) a material representation of fact was made; (2) it was false; (3) the speaker knew it was false when it was made or the speaker made it recklessly without knowledge of its truth; (4) the representation was made with the intention that it should be acted upon by the party; (5) the party acted in reasonable reliance upon it; and (6) the party suffered injury. *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex.1983). There is no evidence in the record which identifies any specific false representation of fact attributed to Montgomery Ward.

■ Throughout her brief, Horton claims her affidavit and the affidavits of four other employees presented triable issues of fact. However, the affidavits are filled with legal conclusions, unsupported statements, and nothing which raises a fact issue regarding any intent on the part of Montgomery Ward to injure her. Affidavits in opposition to a motion for summary judgment must set forth facts, not legal conclusions. *Mercer v. Daoran Corp.*, 676 S.W.2d 580, 583 (Tex.1984). Rule 166a(f) of the Texas Rules of Civil Procedure provides that opposing affidavits "shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Having failed to comply with the above rule, the trial court could properly ignore Horton's affidavits. The first point of error is overruled.

Because the overruling of the first point of error results in an affirmance, it is un-

necessary to address the Rule 13 sanction point.

The judgment of the trial court is affirmed.