Ellen DURCKEL, Appellant,

v.

ST. JOSEPH HOSPITAL and Kim Nettleton, Appellees.

No. 14–01–00104–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

May 9, 2002.

Thomas E. Bilek, Houston, Wilmer D. Masterson, Dallas, for appellant.

Victoria Phipps, Houston, for appellees.

Panel consists of Justices ANDERSON, HUDSON, and FROST.

## OPINION

KEM THOMPSON FROST, Justice.

This case arises out of an employment dispute. Appellant Ellen Durckel appeals a summary judgment granted in favor of appellees, St. Joseph Hospital (the "Hospital") and Kim Nettleton. In four issues, Durckel contends the trial court erred in granting summary judgment disposing of her claims for breach of contract, defamation, intentional infliction of emotional distress, and punitive damages. We affirm.

### I. FACTUAL AND PROCEDURAL BACKGROUND

In May of 1987, the Hospital hired Durckel as its Director of Public Relations. In December of 1992, the Hospital promoted Durckel to Executive Producer of its Marketing Department. Durckel's duties as Executive Producer included producing television programs as part of the Hospital's marketing efforts. Funding for these television programs came from the Marketing Department's budget, administered by Nettleton, the Director of Marketing. Nettleton, however, was not Durckel's supervisor. While serving as Executive Producer, Durckel reported directly to Sally Jeffcoat, the Hospital's Chief Executive Officer.

Durckel and Nettleton frequently disagreed on whether the television programs were an effective marketing tool. The Hospital lacked an accurate method of determining whether the programs Durckel produced generated more or less revenue for the Hospital than other marketing tools. The Hospital's only method of determining the effectiveness of its marketing efforts came from an inquiry system for incoming telephone calls. The Hospital's central call center simply asked callers the source of information generating the call and then recorded the caller's response, *e.g.*, physician referral, television program, etc. Almost every year the information from the call center was compiled into a Financial Reconciliation Report, sometimes referred to as a "Revenue Report," and was then used to help analyze the effectiveness of the Hospital's various marketing efforts. According to Durckel's affidavit, Nettleton prepared a Revenue Report for the time period between July 1, 1996, and June 30, 1997, and circulated it at a meeting in June of 1997, attended by the marketing staff and the directors of the Hospital.[1] With regard to the television programs Durckel produced, the report showed discounted revenue of $69,210 for fiscal year 1997. Durckel maintains that this amount is a significant understatement of the actual revenue. Because Nettleton could not estimate the exact amount of revenue generated from the different marketing efforts, she included a disclaimer at the end of the report. The disclaimer stated:

> These figures are exact matches only between CentraMax and HBO. Reflect only those callers accurately captured through the call center. In addition, many of our promotions featured physicians, and patients frequently sidestep the call center and go directly to the doctor. Those revenues cannot be accounted for.

Durckel alleges Nettleton's Revenue Report was completely false as to the amount of revenue generated by her television pro-

---

1. It might seem unusual that this meeting occurred in June of 1997, given that the Revenue Report contained data for a time period that ended on June 30, 1997. In fact, Durckel testified at her deposition that she did not know if this meeting actually occurred in June of 1997. Nonetheless, Durckel's affidavit states that this meeting occurred in June of 1997. The exact timing of the meeting is not material to the issues presented in this appeal.

grams and that the report defamed her by "attempting to show that she was not fit for her position and occupation with the Hospital." Around January of 1998, Durckel complained for the first time to her supervisor, Jeffcoat, that she believed the Revenue Report was false. Durckel also made this same complaint to Mario de los Santos, the Human Resources Director. After Durckel's complaint, Jeffcoat met with Nettleton to discuss Durckel's accusations. Thereafter, Nettleton called a meeting of the entire marketing staff. Nettleton, flushed and shaking, handed out a memo to the staff and apologized for any unprofessional behavior. Nettleton's memo contained the following statement:

> It has been clear throughout the organization and throughout our department that [Durckel] and I have not been seeing eye to eye on many issues. I apologize for our unprofessional behavior and the blemish it has cast on this department's ability to do the tasks at hand. I take complete responsibility for insuring that it will not continue to be an issue and that this department will again work as the team it has always enjoyed [sic] and with the professionalism for which each of you is known.

Because the memo noted her previous confrontations with Nettleton, Durckel believed the memo was a threat to retaliate against her. Durckel also claims that in January of 1998, sometime before she made her complaint that the Revenue Report was false, Nettleton stated "someone is going to lose their job and it is not going to be me." Although she interpreted this statement as a threat, Durckel did not mention it to anyone at the time it was made.

On April 15, 1998, Durckel met with Jeffcoat to discuss her future as Executive Producer of Marketing for the Hospital. Jeffcoat explained that she had decided to reorganize the Marketing Department to reduce costs; however, Jeffcoat was unsure of the structure of the new organization. Although Jeffcoat did not terminate Durckel at that time, she told Durckel that she should consider applying for another job.

One month later, Durckel was told that her position would be eliminated, effective June 12, 1998. Durckel's termination was confirmed by a letter dated May 29, 1998, in which Jeffcoat told Durckel that the Hospital was eliminating her position because of a change in the marketing strategy. Sometime after she received word of her termination, Durckel asked Jeffcoat if she could buy the Hospital's Beta machine, which was used for viewing film. Then, without first obtaining permission, Durckel took the machine and left a check for what she considered to be its reasonable value.

Durckel claimed she was terminated solely because she brought an ethics complaint against Nettleton. On June 17, 1998, Durckel met with Brad Mitchell, the Hospital's Chief Operating Officer, to discuss her termination and her rights under the Hospital's integrity policy against employee retaliation. At their meeting, Mitchell informed Durckel that the Hospital was missing a camera,[2] referring to the Beta machine, and stated that she needed to return it immediately. Durckel claims Mitchell was rude to her and accused her of stealing the Hospital's property.

Six months after Durckel's termination, Nettleton and most of the Hospital's marketing department were also terminated, in a round of budget cuts. The Hospital

---

**2.** Although Mitchell used the term "camera" to describe the missing property, it is clear from the record that both he and Durckel knew he was referring to the Hospital's Beta machine.

reduced its workforce in fiscal year 1998 because it had lost nearly $3 million. The Hospital lost another $4.5 million in fiscal year 1999.

Durckel sued the Hospital and Nettleton, asserting claims for breach of contract/wrongful termination, defamation, and intentional infliction of emotional distress. The Hospital and Nettleton filed a motion for summary judgment. The trial court granted summary judgment and entered a take-nothing judgment against Durckel.

## II. STANDARD OF REVIEW

The standard for reviewing a summary judgment is whether the successful movant at the trial level carried its burden of showing that there is no genuine issue of material fact and that judgment should be granted as a matter of law. *KPMG Peat Marwick v. Harrison County Housing Fin. Corp.*, 988 S.W.2d 746, 748 (Tex.1999). In conducting our review, we take as true all evidence favorable to the nonmovant, and we make all reasonable inferences in the nonmovant's favor. *Id.* A movant is entitled to summary judgment when it negates at least one element of the plaintiff's theory of recovery or pleads and conclusively establishes each element of an affirmative defense. *Science Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex.1997). Because the trial court's order did not specify the grounds for its ruling, we will affirm if any of the theories advanced in the motion are meritorious. *See Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex.1989).

## III. BREACH OF CONTRACT/WRONGFUL TERMINATION CLAIM

■ In her first issue, Durckel contends the trial court erred in granting summary judgment as to her breach of contract claim because the Hospital's Corporate Integrity Policy modified her employment-at-

will status and limited the Hospital's right to terminate her at any time and for any reason. Durckel asserts that the Hospital's Corporate Integrity Policy imposes a contractual obligation on the Hospital not to terminate her for bringing a complaint under this policy, and that the Hospital breached this contract when it terminated her employment for bringing a complaint against Nettleton. We disagree with Durckel's assertions.

■ It is undisputed that the Hospital employed Durckel on an at-will basis. Thus, we must determine if the Hospital ever expressly modified the at-will relationship during Durckel's employment. As the discharged employee, Durckel bears the burden of proving that the parties contractually agreed to limit the at-will relationship. *See Hussong v. Schwan's Sales Enters.*, 896 S.W.2d 320, 323 (Tex.App.-Houston [1st Dist.] 1995, no writ).

■ In order to establish a wrongful termination claim based on a written contract of employment, Durckel must prove that her contract specifically limited the Hospital's right to terminate her at will. *See Montgomery County Hosp. Dist. v. Brown*, 965 S.W.2d 501, 505 (Tex.1998); *Stiver v. Texas Instruments, Inc.*, 750 S.W.2d 843, 846 (Tex.App.-Houston [14th Dist.] 1988, no writ). Under Texas law, we presume Durckel remained an at-will employee throughout her employment. *See Fed. Express Corp. v. Dutschmann*, 846 S.W.2d 282, 283 (Tex.1993). Durckel must prove that the Hospital expressly, clearly, and specifically agreed to modify her at-will status. *See Montgomery County Hosp. Dist.*, 965 S.W.2d at 503; *Miksch v. Exxon Corp.*, 979 S.W.2d 700, 703 (Tex. App.-Houston [14th Dist.] 1998, pet. denied); *Byars v. City of Austin*, 910 S.W.2d 520, 523–24 (Tex.App.-Austin 1995, writ denied). Any such agreement by the Hos-

pital must provide in a "special and meaningful way" that the Hospital does not have the right to terminate Durckel at will. *See Montgomery County Hosp. Dist.*, 965 S.W.2d at 505; *see also Figueroa v. West*, 902 S.W.2d 701, 704 (Tex.App.-El Paso 1995, no writ).

The only evidence Durckel produced to show the Hospital modified the at-will relationship was the integrity policy itself. The integrity policy does not specifically or expressly limit the Hospital's right to terminate its employees at will. There is nothing stated in the policy as to whether the Hospital could terminate an employee that reported misconduct under the policy. The pertinent part of the policy states:

> Based on foundational principles, the Sisters of Charity Health Care System and its operating units will not tolerate behaviors that are or may be perceived as retaliatory to employees as a result of an employee's action, in good faith, to make known issues or concerns in the workplace.

■■■ In support of her argument that the above policy clearly and expressly altered the at-will relationship in a meaningful way, Durckel relies on *Vida v. El Paso Employees' Federal Credit Union*, 885 S.W.2d 177 (Tex.App.-El Paso 1994, no writ). In *Vida*, an employee brought a wrongful termination suit claiming that she was discharged from her position of employment in retaliation for using the employer's internal grievance procedures. 885 S.W.2d at 179. The employee's petition alleged that her termination was "without legal justification or excuse, and in violation of [her] contractual rights under the employer's 'Personal Policy Manual.'" *Id.* The employer moved for summary judgment on grounds that the manual could not, as a matter of law, constitute a contract. *Id.* The manual contained a provision specifi-

cally and expressly promising that " '[n]o employee shall be penalized for using its grievance procedure.'" *Id.* at 181. The El Paso Court of Appeals found that this policy narrowly and explicitly restricted the employer's right to terminate an employee for using the grievance procedure. *Id.* The *Vida* court held that "although the at-will doctrine still governed the relationship between the plaintiff and defendant in most areas, the employer made a specific pledge that it would not terminate (or otherwise retaliate against) an employee for a single, particular reason." *Id.* at 180. The language contained in the Hospital's policy, although similar, does not constitute an unequivocal commitment not to terminate an employee for a particular reason. *See Byars*, 910 S.W.2d at 523–24; *Horton v. Montgomery Ward & Co.*, 827 S.W.2d 361, 370 (Tex.App.-San Antonio 1992, writ denied). For an agreement altering at-will status to exist, "the employer must unequivocally indicate a definite intent to be bound not to terminate the employee except under clearly specified circumstances." *Montgomery County Hosp. Dist.*, 965 S.W.2d at 502. General statements about working conditions, disciplinary procedures, or termination rights are not sufficient to change the at-will employment relationship; rather, the employer must expressly, clearly, and specifically agree to modify the employee's at-will status. *Byars*, 910 S.W.2d at 523–24; *Horton*, 827 S.W.2d at 370; *Salazar v. Amigos Del Valle, Inc.*, 754 S.W.2d 410, 413 (Tex.App.-Corpus Christi 1988, no writ).

There is no summary-judgment evidence that creates a genuine issue of material fact as to the existence of this type of agreement by the Hospital. The policy upon which Durckel relies does not expressly limit the Hospital's right to termi-

nate its employees at will. As a matter of law, Durckel was an at-will employee. Thus, the trial court correctly granted summary judgment as to her breach of contract/wrongful termination claim. *See Montgomery County Hosp. Dist.*, 965 S.W.2d at 502–05; *Welch v. Doss Aviation, Inc.*, 978 S.W.2d 215, 221 (Tex.App.-Amarillo 1998, no pet.); *Byars*, 910 S.W.2d at 523–24. We overrule Durckel's first issue.

## IV. DEFAMATION CLAIM

In her second issue, Durckel asserts, among other things, that the trial court erred in granting summary judgment regarding her defamation claim because there was a genuine issue of material fact as to whether the alleged defamatory statements have a defamatory meaning. Durckel's defamation claim is based on: (1) the Revenue Report prepared by Nettleton; and (2) statements made by Brad Mitchell, the Hospital's Chief Operating Officer.

First, Durckel claims that it is apparent that Nettleton knowingly falsified the figures in the Revenue Report, thereby implying that Durckel was incapable of doing her job. Second, Durckel maintains Mitchell's comments that "a camera is missing" and "you need to return it to the hospital" clearly charged her with theft. Nettleton and the Hospital counter that the statements are not defamatory, and even if they are, the qualified privilege applies.

Whether an unambiguous statement is reasonably capable of defamatory meaning is a dispositive question of law. *Musser v. Smith Protective Servs., Inc.*, 723 S.W.2d 653, 655 (Tex.1987). Statements that neither identify the plaintiff nor set forth any wrongful conduct have no defamatory meaning. *Delta Air Lines v. Norris*, 949 S.W.2d 422, 426 (Tex.App.-Waco 1997, pet. denied).

### A. Revenue Report

Durckel contends the Revenue Report Nettleton distributed at the June meeting grossly understated the revenue and falsely represented the unprofitability of the television programs Durckel produced. Durckel claims the Revenue Report suggests she was incompetent or incapable of doing her job. Durckel also claims that this Revenue Report caused her to be fired and hindered her abilities to find new employment.

Libel is defined by statute as a "defamation expressed in written or other graphic form that tends to ... injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation or to publish the natural defects of anyone and thereby expose the person to public hatred, ridicule, or financial injury." TEX. CIV. PRAC. & REM.CODE § 73.001. In order to be libelous, a statement must be capable of having a defamatory meaning. *See Musser*, 723 S.W.2d at 655.

In a libel action, the trial court initially must determine, as a matter of law, whether the words used are reasonably capable of defamatory meaning by considering the alleged defamatory statement as a whole; the determination is based upon how a person of ordinary intelligence would perceive the entire statement. *Id.* at 654–55. "The question should not be submitted to the jury unless the language is ambiguous or of doubtful import." *Garcia v. Burris*, 961 S.W.2d 603, 605 (Tex.App.-San Antonio 1997, pet. denied). The statements alleged to be defamatory must be viewed in their context; they may be false, abusive, unpleasant, or objectionable to the plaintiff and still not

be defamatory in light of the surrounding circumstances. *San Antonio Express News v. Dracos,* 922 S.W.2d 242, 248 (Tex. App.-San Antonio 1996, no writ).

The Revenue Report did not identify Durckel by name nor could the revenue reflected in the Revenue Report reasonably be interpreted to indicate that Durckel was not adequately performing her job. The Revenue Report is an internal, informal accounting document that is expressly subject to a significant qualification. The Revenue Report does not refer to Durckel or her job performance in any way. It merely states that, based only on exact matches between CentraMax and HBO, there was $69,210 in revenue for all television programs. This statement as a whole is not reasonably capable of a defamatory meaning because it says nothing about Durckel's capabilities or job performance and because it would not be reasonable to infer from this statement that Durckel was incompetent or incapable of doing her job. *See Huckabee v. Time Warner Entm't Co., L.P.,* 19 S.W.3d 413, 429–30 (Tex.2000) (holding that general statement about family courts was not reasonably capable of a defamatory meaning as to the specific family-court judge); *Musser,* 723 S.W.2d at 654–55 (holding that statement that claimant "was able . . . to relieve us of certain of our polygraph accounts" was not reasonably capable of a defamatory meaning); *Newspapers, Inc. v. Matthews,* 161 Tex. 284, 339 S.W.2d 890, 893 (1960) (holding statements not reasonably capable of defamatory meaning); *Einhorn v. LaChance,* 823 S.W.2d 405, 411 (Tex.App.-Houston [1st Dist.] 1992, writ dism'd w.o.j.) (holding that statement that employee was fired based solely on work performance was nonspecific and not reasonably capable of a defamatory meaning). Therefore, the trial court did not err in granting summary judgment as to Durckel's defamation claim regarding the Revenue Report.

## B. Statements Made by Mitchell

 Next, Durckel complains of statements Mitchell made during their meeting discussing both Durckel's termination and her rights under the Hospital's integrity policy. Durckel alleges that Mitchell accused her of theft. During her deposition, Durckel testified:

Q: Okay. What did Brad Mitchell tell you during this meeting?

A: He was very impatient, very abrupt. Had no interest in listening to any integrity issue. Hardly had the time of day. And he said that I had taken a camera from the hospital, that I had violated Hospital policy and that I needed to return the camera.

Q: All right.

A: I felt very violated. I felt accused of theft, and I felt very defamed.

Q: All right. Now, he did not tell you that you had stolen this camera—he didn't [sic] tell you that, did he?

A: His specific words were a camera is missing.

Q: Uh-huh.

A: And you need to return it to the hospital.

. . .

Q: So those words don't include the words and we think you stole it, right?

A: They imply it fairly clearly I would say.

. . .

Q: But to your knowledge, no police report was filed against you, to your knowledge, is that right?

A: No.

Q: Okay. And no one sent you any letters saying we believe you've stolen

our equipment, please bring it back, did they?

A: No.

. . .

Q: The charge of theft is something that you're implying, is that correct, because no one ever charged you, no one ever put out a charge against you of theft, did they?

A: No, not a legal charge of theft.

Q: Not even a charge—a report to your—[sic] in writing saying you have stolen our equipment, you are thief. There is nothing like that in writing, is there?

A: No, there is not.

Q: And he [Mitchell] never called you a thief. He never said you are a thief, Ms. Durckel, did he?

A: He did not say those words, no, he did not.

. . .

Q: Did Brad Mitchell publish a statement labeling you a thief to anyone other than the conversation you and he had?

A: Not to my knowledge.

As to Mitchell's statements, Durckel bases her defamation claim on his alleged statements that "a camera is missing" and "you need to return it to the hospital." Mitchell knew Durckel had taken a camera (Beta machine) and left a check for the amount which she believed was its value. Wanting the Hospital's property back, Mitchell told Durckel that she needed to return the missing camera. Examining Mitchell's statements as a whole and in their context, they do not imply Durckel is a thief or that she had stolen the camera. Durckel had taken the camera without permission, and the Hospital wanted it back. Mitchell never called Durckel a thief nor did he or any other member of the Hospital bring charges of theft against Durckel. In fact, Durckel herself testified that Mitchell never directly called her a thief and that the Hospital never reported that Durckel had stolen the camera or that she was a thief.

Durckel also points to her affidavit, which states that "Mitchell accused [her] of theft" and "defamed [her] by publishing a charge that [she] was guilty of theft in having taken a Beta machine." We do not consider the statements in Durckel's affidavit because they are conclusory statements that do not preclude the entry of summary judgment against her. *See Anderson v. Snider,* 808 S.W.2d 54, 55 (Tex.1991); *Dolcefino v. Randolph,* 19 S.W.3d 906, 930 (Tex.App.-Houston [14th Dist.] 2000, pet. denied).

■ To prove a defamation claim, a plaintiff may use innuendo to explain the statements. *Schauer v. Memorial Care Sys.,* 856 S.W.2d 437, 438 (Tex.App.-Houston [1st Dist.] 1993, no writ), *disapproved on other grounds by Huckabee v. Time Warner Entm't Co., L.P.,* 19 S.W.3d 413, 415 (Tex.2000). Innuendo, however, does not permit a plaintiff to change the meaning, extend the meaning, or impose a strained construction on the words. *ABC, Inc. v. Shanks,* 1 S.W.3d 230, 236 (Tex. App.-Corpus Christi 1999, pet. denied). If an ordinary person cannot ascribe the defamatory meaning through innuendo, the words do not have a defamatory meaning. *Simmons v. Ware,* 920 S.W.2d 438, 451 (Tex.App.-Amarillo 1996, no writ). Mitchell's statements are not reasonably capable of a defamatory meaning as to Durckel. *See Huckabee,* 19 S.W.3d at 429–30; *Musser,* 723 S.W.2d at 654–55; *Einhorn,* 823 S.W.2d at 411. Therefore, summary judgment on Durckel's defamation claim was proper as a matter of law. We overrule Durckel's second issue.

## V. Intentional Infliction of Emotional Distress Claim

In her third issue, Durckel contends the trial court erred in granting summary judgment on her claim for intentional infliction of emotional distress. Nettleton and the Hospital contend the evidence establishes nothing more than an ordinary employment dispute. We agree with Nettleton and the Hospital.

An employee may recover damages for intentional infliction of emotional distress in an employment context as long as the employee establishes the elements of this claim. *Wornick Co. v. Casas*, 856 S.W.2d 732, 734 (Tex.1993). To recover damages for intentional infliction of emotional distress, a plaintiff must prove: (1) the defendant acted intentionally or recklessly; (2) the conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe. *Standard Fruit & Vegetable Co. v. Johnson*, 985 S.W.2d 62, 65 (Tex.1998). In addition, "[a] claim for intentional infliction of emotional distress cannot be maintained when the risk that emotional distress will result is merely incidental to the commission of some other tort." *Id.* at 68. Accordingly, a claim for intentional infliction of emotional distress will not lie if emotional distress is not the intended or primary consequence of the defendant's conduct. *Id.*

In their motion for summary judgment, Nettleton and the Hospital contest their liability for intentional infliction of emotional distress on the grounds that the alleged actions forming the basis of the claim do not rise to the level necessary to constitute extreme and outrageous conduct. To be extreme and outrageous, conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Natividad v. Alexsis, Inc.*, 875 S.W.2d 695, 699 (Tex. 1994) (quoting *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex.1993)).

Texas courts have adopted a strict approach to intentional-infliction-of-emotional-distress claims arising in the workplace. *See, e.g., Miller v. Galveston/Houston Diocese*, 911 S.W.2d 897, 900–01 (Tex. App.-Amarillo 1995, no writ); *Amador v. Tan*, 855 S.W.2d 131, 135 (Tex.App.-El Paso 1993, writ denied); *Horton v. Montgomery Ward & Co.*, 827 S.W.2d 361, 369 (Tex.App.-San Antonio 1992, writ denied) (holding that "incidents in which a Texas court has determined the conduct to be extreme and outrageous in the employer/employee setting are few"); *see also Johnson v. Merrell Dow Pharms.*, 965 F.2d 31, 33 (5th Cir.1992) (applying Texas law and affirming summary judgment where claim was based on alleged course of harassing conduct culminating in termination). Underlying these decisions is the sensible notion that to properly manage its business, an employer must be able to supervise, review, criticize, demote, transfer, and discipline employees. *See, e.g., Johnson*, 965 F.2d at 34; *Miller*, 911 S.W.2d at 901; *Diamond Shamrock Ref. & Mktg. Co. v. Mendez*, 809 S.W.2d 514, 522 (Tex.App.-San Antonio 1991), *aff'd in part and rev'd in part on other grounds*, 844 S.W.2d 198 (Tex.1992). Given these considerations, Texas courts have held that a claim for intentional infliction of emotional distress does not lie for ordinary employment disputes. *Miller*, 911 S.W.2d at 900–01; *see also Johnson*, 965 F.2d at 33. The range of behavior encompassed in "employment disputes" is broad, and includes, at a minimum, such things as criticism, lack of recognition, and low evaluations, which, although unpleasant and sometimes unfair, are ordinarily expected in the work

environment. *Johnson,* 965 F.2d at 33–34; *see also Wilson v. Monarch Paper Co.,* 939 F.2d 1138, 1143 (5th Cir.1991) (stating "the facts of a given claim of outrageous conduct must be analyzed in context").

Generally, insensitive or even rude behavior does not constitute extreme and outrageous conduct. *Natividad,* 875 S.W.2d at 699.[3] Similarly, mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities do not rise to the level of extreme and outrageous conduct. *Porterfield v. Galen Hosp. Corp.,* 948 S.W.2d 916, 920 (Tex.App.-San Antonio 1997, writ denied). Thus, to establish a claim for intentional infliction of emotional distress in the workplace, an employee must prove the existence of some conduct that brings the dispute outside the scope of an ordinary employment dispute and into the realm of extreme and outrageous behavior. *Ramirez v. Allright Parking El Paso, Inc.,* 970 F.2d 1372, 1376 (5th Cir. 1992) (requiring employee to show conduct "elevating [the employer's] actions above those involved in an 'ordinary employment dispute' ").[4]

The Texas Supreme Court's opinion in *GTE Southwest, Inc. v. Bruce* is particularly instructive. 998 S.W.2d 605 (Tex. 1999). In that case, the Texas Supreme Court evaluated conduct that was alleged to constitute intentional infliction of emotional distress occurring in an employment context. *Id.* at 609. Though holding that evidence of a supervisor's conduct was legally sufficient to support the jury's finding of intentional infliction of emotional distress, the Texas Supreme Court cautioned that this tort "does not lie for ordinary employment disputes," and that extreme and outrageous conduct in the employment context "exists only in the most unusual of circumstances." *Id.* at 612–13. An employer must have latitude to exercise its rights to supervise and criticize, in a permissible way, even though emotional distress may result. *Id.*

---

**3.** *See, e.g., Diamond Shamrock Ref. & Mktg. Co. v. Mendez,* 844 S.W.2d 198 (Tex.1992) (stating conduct of employer who wrongfully accused plaintiff of thievery and fired him was not extreme and outrageous conduct); *Porterfield v. Galen Hosp. Corp.,* 948 S.W.2d 916 (Tex.App.-San Antonio 1997, writ denied) (holding verbal abuse, refusal to allow plaintiff lunch breaks, and hostile demonstrations when plaintiff left work sick was not extreme and outrageous conduct); *Beiser v. Tomball Hosp. Auth.,* 902 S.W.2d 721 (Tex.App.-Houston [1st Dist.] 1995, writ denied) (stating termination in violation of a whistleblower statute was not in itself extreme and outrageous conduct); *Garcia v. Andrews,* 867 S.W.2d 409 (Tex.App.-Corpus Christi 1993, no writ) (holding conduct of manager who made sexually suggestive and embarrassing remarks to plaintiff and mentally undressed her, was not extreme and outrageous); *Horton,* 827 S.W.2d at 361 (holding conduct of co-worker who cursed at plaintiff, committed assault and battery, hit her with a wad of paper, placed rattlesnake rattlers in her desk, and defaced her pictures was not extreme and outrageous).

**4.** In *Dean v. Ford Motor Credit Co.,* 885 F.2d 300, 307 (5th Cir.1989), the court recognized that the supervisor's act of placing checks in the employee's purse to make it appear that she was a thief and to put her in fear of criminal prosecution was extreme and outrageous. In addition, in *Wilson v. Monarch Paper Co.,* 939 F.2d 1138, 1145 (5th Cir.1991), the court found extreme and outrageous the employer's intentional and systematic actions to humiliate the plaintiff, a long-time executive with a college education and thirty years' experience, by requiring him to do menial janitorial duties. *See Wilson,* 939 F.2d at 1145; *but see Saucedo v. Rheem Mfg. Co.,* 974 S.W.2d 117, 124 (Tex.App.-San Antonio 1998, pet. denied) (holding that supervisor swearing at employee, calling him obscene names, insulting and threatening to fire employee, and blaming employee for supervisor's mistakes did not rise to the level of extreme and outrageous).

Accordingly, in order to prove her claim, Durckel had to show the existence of some conduct that brings an ordinary employment dispute into the realm of extreme and outrageous behavior. *See id.* at 613. She failed to do so. The alleged conduct in this case does not constitute extreme and outrageous behavior. Neither the Revenue Report nor Mitchell's statements rise to a level beyond that of an ordinary workplace dispute. Durckel failed to present evidence raising a genuine issue of material fact on whether the alleged conduct was extreme and outrageous. Because we find Nettleton and the Hospital negated the second element of Durckel's claim for intentional infliction of emotional distress—that the conduct was extreme and outrageous—summary judgment on this claim was proper. *See Science Spectrum,* 941 S.W.2d at 911. We overrule Durckel's third issue.

## VI. PUNITIVE DAMAGES

In her fourth issue, Durckel contends the trial court erred in granting summary judgment on her claim for punitive damages. Durckel maintains that punitive damages are appropriate when an employer discriminates "in the face of a perceived risk that its actions will violate ... law." *See Kolstad v. American Dental Ass'n,* 527 U.S. 526, 539, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999). Because Nettleton and the Hospital proved they were entitled to judgment as a matter of law on Durckel's claims for breach of contract/wrongful termination, defamation, and intentional infliction of emotional distress, we find that summary judgment was also proper on Durckel's claim for punitive damages. *See Twin City Fire Ins. Co. v. Davis,* 904 S.W.2d 663, 665 (Tex.1995) (plaintiffs cannot recover punitive damages unless they first recover under an indepen-

dent tort claim). Accordingly, we overrule Durckel's fourth issue.

We affirm the trial court's judgment.