Affirmed and Opinion filed May 9, 2002









Affirmed
and Opinion filed May 9, 2002.

 

 

 

 

In The

 

Fourteenth Court of Appeals

____________

 

NO.
14-01-00104-CV

____________

 

ELLEN DURCKEL, Appellant

 

V.

 

ST. JOSEPH HOSPITAL and KIM NETTLETON,
Appellees

 



 

On
Appeal from the 190th District Court

Harris County, Texas

Trial
Court Cause No. 99-06967

 



 

O
P I N I O N

This case arises out of an employment dispute.  Appellant
Ellen Durckel appeals a summary judgment granted in
favor of appellees, St. Joseph Hospital (the AHospital@)
and Kim Nettleton.  In four issues, Durckel contends the trial court erred in granting summary
judgment disposing of her claims for breach of contract, defamation,
intentional infliction of emotional distress, and punitive damages.  We affirm.








I.  Factual and
Procedural Background

In May of 1987, the Hospital hired Durckel
as its Director of Public Relations.  In
December of 1992, the Hospital promoted Durckel to
Executive Producer of its Marketing Department. 
Durckel=s duties as Executive Producer
included producing television programs as part of the Hospital=s marketing efforts.  Funding for these television programs came
from the Marketing Department=s budget, administered by Nettleton, the Director of
Marketing.  Nettleton, however, was not Durckel=s supervisor.  While
serving as Executive Producer, Durckel reported
directly to Sally Jeffcoat, the Hospital=s Chief Executive Officer.  








Durckel and Nettleton frequently disagreed
on whether the television programs were an effective marketing tool.  The Hospital lacked an accurate method of
determining whether the programs Durckel produced
generated more or less revenue for the Hospital than other marketing
tools.  The Hospital=s only method of determining the
effectiveness of its marketing efforts came from an inquiry system for incoming
telephone calls.  The Hospital=s central call center simply asked
callers the source of information generating the call and then recorded the
caller=s response, e.g., physician
referral, television program, etc. 
Almost every year the information from the call center was compiled into
a Financial Reconciliation Report, sometimes referred to as a ARevenue Report,@ and was then used to help analyze
the effectiveness of the Hospital=s various marketing efforts.  According to Durckel=s affidavit, Nettleton prepared a
Revenue Report for the time period between July 1, 1996, and June 30, 1997, and
circulated it at a meeting in June of 1997, attended by the marketing staff and
the directors of the Hospital.[1]  With regard to the television programs Durckel produced, the report showed discounted revenue of
$69,210 for fiscal year 1997.  Durckel maintains that this amount is a significant
understatement of the actual revenue. 
Because Nettleton could not estimate the exact amount of revenue
generated from the different marketing efforts, she included a disclaimer at
the end of the report.  The disclaimer
stated:

These figures are exact matches only
between CentraMax and HBO.  Reflect only those callers accurately
captured through the call center.  In
addition, many of our promotions featured physicians, and patients frequently
sidestep the call center and go directly to the doctor.  Those revenues cannot be accounted for. 

Durckel alleges Nettleton=s Revenue Report was completely false
as to the amount of revenue generated by her television programs and that the
report defamed her by Aattempting to show that she was not fit for her position and
occupation with the Hospital.@              Around January of 1998, Durckel complained for the first time to her supervisor, Jeffcoat, that she believed the Revenue Report was
false.  Durckel
also made this same complaint to Mario de los Santos,
the Human Resources Director.  After Durckel=s complaint, Jeffcoat met with
Nettleton to discuss Durckel=s accusations.  Thereafter,  Nettleton called a meeting of the
entire marketing staff.  Nettleton,
flushed and shaking, handed out a memo to the staff and apologized for any
unprofessional behavior.  Nettleton=s memo contained the following
statement: 

It has been clear throughout the
organization and throughout our department that [Durckel]
and I have not been seeing eye to eye on many
issues.  I apologize for our
unprofessional behavior and the blemish it has cast on this department=s ability to do the tasks at
hand.  I take complete responsibility for
insuring that it will not continue to be an issue and that this department will
again work as the team it has always enjoyed [sic] and with the professionalism
for which each of you is known.  

Because the memo noted her previous confrontations with Nettleton, Durckel believed the memo was a threat to retaliate against
her.  Durckel
also claims that in January of 1998, sometime before she made her complaint
that the Revenue Report was false, Nettleton stated Asomeone is going to lose their job
and it is not going to be me.@  Although she
interpreted this statement as a threat, Durckel did
not mention it to anyone at the time it was made. 








On April 15, 1998, Durckel met with
Jeffcoat to discuss her future as Executive Producer
of Marketing for the Hospital.  Jeffcoat explained that she had decided to reorganize the
Marketing Department to reduce costs; however, Jeffcoat
was unsure of the structure of the new organization.  Although Jeffcoat
did not terminate Durckel at that time, she told Durckel that she should consider applying for another
job.  

One month later, Durckel was told
that her position would be eliminated, effective June 12, 1998.  Durckel=s termination was confirmed by a
letter dated May 29, 1998, in which Jeffcoat told Durckel that the Hospital was eliminating her position
because of a change in the marketing strategy. 
Sometime after she received word of her termination, Durckel
asked Jeffcoat if she could buy the Hospital=s Beta machine, which was used for
viewing film.  Then, without first
obtaining permission, Durckel took the machine and
left a check for what she considered to be its reasonable value. 

Durckel claimed she was terminated solely
because she brought an ethics complaint against Nettleton.  On June 17, 1998, Durckel
met with Brad Mitchell, the Hospital=s Chief Operating Officer, to discuss
her termination and her rights under the Hospital=s integrity policy against employee
retaliation.  At their meeting, Mitchell
informed Durckel that the Hospital was missing a
camera,[2]
referring to the Beta machine, and stated that she needed to return it
immediately.  Durckel
claims Mitchell was rude to her and accused her of stealing the Hospital=s property.  

Six months after Durckel=s termination, Nettleton and most of
the Hospital=s marketing department were also
terminated, in a round of budget cuts. 
The Hospital reduced its workforce in fiscal year 1998 because it had
lost nearly $3 million.  The Hospital lost another $4.5 million in fiscal year 1999.  








Durckel sued the
Hospital and Nettleton, asserting claims for breach of contract/wrongful
termination, defamation, and intentional infliction of emotional distress.  The Hospital and Nettleton filed a motion for
summary judgment.  The trial court
granted summary judgment and entered a take-nothing judgment against Durckel.

II. 
Standard of Review

The standard for reviewing
a summary judgment is whether the successful movant
at the trial level carried its burden of showing that there is no genuine issue
of material fact and that judgment should be granted as a matter of law.  KPMG Peat Marwick v.
Harrison County Housing Fin. Corp., 988 S.W.2d 746, 748 (Tex. 1999).  In conducting our review, we take as true all
evidence favorable to the nonmovant, and we make all
reasonable inferences in the nonmovant=s favor.  Id. 
A movant is entitled to summary judgment when
it negates at least one element of the plaintiff=s theory of recovery or
pleads and conclusively establishes each element of an affirmative
defense.  Science
Spectrum, Inc. v. Martinez, 941 S.W.2d 910, 911 (Tex. 1997).  Because the trial court=s order did not specify the grounds
for its ruling, we will affirm if any of the theories advanced in the motion
are meritorious.  See Carr v.
Brasher, 776 S.W.2d 567, 569 (Tex. 1989).

III.  Breach of Contract/Wrongful
Termination Claim 

In
her first issue, Durckel contends the trial court
erred in granting summary judgment as to her breach of contract claim because
the Hospital=s Corporate Integrity Policy modified her employment-at-will
status and limited the Hospital=s right to terminate her at any time and for any reason.  Durckel asserts
that the Hospital=s Corporate Integrity Policy imposes a contractual obligation
on the Hospital not to terminate her for bringing a complaint under this
policy, and that the Hospital breached this contract when it terminated her
employment for bringing a complaint against Nettleton.  We disagree with Durckel=s
assertions. 








It
is undisputed that the Hospital employed Durckel on
an at-will basis.  Thus, we must
determine if the Hospital ever expressly modified the at-will relationship
during Durckel=s employment.  As the
discharged employee, Durckel bears the burden of
proving that the parties contractually agreed to limit the at-will
relationship.  See Hussoung
v. Schwan=s Sales Enters., 896 S.W.2d 320,323 (Tex. App.CHouston [1st Dist.] 1995, no writ). 

In
order to establish a wrongful termination claim based on a written contract of
employment, Durckel must prove that her contract
specifically limited the Hospital=s right to terminate her at will.  See Montgomery County Hosp. Dist. v. Brown,
965 S.W.2d 501, 505 (Tex. 1998); Stiver v.
Texas Instruments, Inc., 750 S.W.2d 843, 846 (Tex. App.CHouston [14th Dist.] 1988, no writ).  Under Texas law, we presume Durckel remained an at-will employee throughout her
employment.  See Fed. Express Corp. v. Dutschmann, 846 S.W.2d 282, 283 (Tex. 1993).  Durckel must prove
that the Hospital expressly, clearly, and specifically agreed to modify her
at-will status.  See Montgomery County
Hosp. Dist., 965 S.W.2d at 503; Miksch
v. Exxon Corp., 979 S.W.2d 700, 703 (Tex. App.CHouston
[14th Dist.] 1998, pet. denied); Byars v.
City of Austin, 910 S.W.2d 520, 523B24 (Tex. App.CAustin 1995, writ denied). 
Any such agreement by the Hospital must provide in a Aspecial
and meaningful way@ that the Hospital does not have the right to terminate Durckel at will.  See
Montgomery County Hosp. Dist., 965 S.W.2d at 505; see also Figueroa v.
West, 902 S.W.2d 701, 704 (Tex. App.CEl
Paso 1995, no writ).  

The
only evidence Durckel produced to show the Hospital
modified the at-will relationship was the integrity policy itself.  The integrity policy does not specifically or
expressly limit the Hospital=s right to terminate its employees at will.  There is nothing stated in the policy as to
whether the Hospital could terminate an employee that reported misconduct under
the policy.  The pertinent part of the
policy states:

Based
on foundational principles, the Sisters of Charity Health Care System and its
operating units will not tolerate behaviors that are or may be perceived as
retaliatory to employees as a result of an employee=s
action, in good faith, to make known issues or concerns in the workplace. 

 








In support of her argument that the above policy clearly and
expressly altered the at-will relationship in a meaningful way, Durckel relies on
Vida v. El Paso Employees= Federal Credit Union,
885 S.W.2d 177 (Tex. App.CEl Paso 1994, no writ).  In Vida, an employee
brought a wrongful termination suit claiming that she was discharged from her
position of employment in retaliation for using the employer=s internal grievance procedures. 885 S.W.2d at 179. 
The employee=s petition alleged that her termination was Awithout legal justification or
excuse, and in violation of [her] contractual rights under the employer=s >Personal Policy Manual.=@ 
Id.  The employer moved for
summary judgment on grounds that the manual could not, as a matter of law,
constitute a contract.  Id.  The manual contained a provision
specifically and expressly promising that A>[n]o employee shall be penalized for
using its grievance procedure.=@ Id. at 181.  The El Paso Court of Appeals found that this
policy narrowly and explicitly restricted the employer=s right to terminate an employee for
using the grievance procedure.  Id.  The Vida court held that Aalthough the at-will doctrine still
governed the relationship between the plaintiff and defendant in most areas,
the employer made a specific pledge that it would not terminate (or otherwise
retaliate against) an employee for a single, particular reason.@ 
Id. at 180.  The language contained in the Hospital=s policy, although similar, does not constitute an unequivocal commitment not to terminate an
employee for a particular reason.  See
Byars, 910 S.W.2d at 523B24;
Horton v. Montgomery Ward & Co., 827 S.W.2d 361, 370 (Tex. App.CSan Antonio 1992, writ denied). 
For an agreement altering at-will status
to exist, Athe employer must unequivocally indicate a definite intent to
be bound not to terminate the employee except under clearly specified
circumstances.@  Montgomery County
Hosp. Dist., 965 S.W.2d at 502.  General statements about working conditions,
disciplinary procedures, or termination rights are not sufficient to change the
at-will employment relationship; rather, the employer must expressly, clearly,
and specifically agree to modify the employee=s at-will status.  Byars, 910 S.W.2d at 523B24;
Horton, 827 S.W.2d at 370;  Salazar v. Amigos Del Valle,
Inc., 754 S.W.2d 410, 413 (Tex. App.CCorpus Christi 1988, no writ). 








There is no
summary-judgment evidence that creates a genuine issue of material fact as to
the existence of this type of agreement by the Hospital.  The policy upon which Durckel
relies does not expressly limit the Hospital=s
right to terminate its employees at will. 
As a matter of law, Durckel was an at-will
employee.  Thus, the trial court
correctly granted 
summary judgment as to her breach of contract/wrongful
termination claim. See Montgomery County Hosp. Dist., 965 S.W.2d at 502B05;
Welch v. Doss Aviation, Inc., 978 S.W.2d 215, 221 (Tex. App.CAmarillo 1998,
no pet.); Byars, 910 S.W.2d at 523B24.  We overrule Durckel=s
first issue. 

IV. 
Defamation Claim 

In
her second issue, Durckel asserts, among other
things, that the trial court erred in granting summary judgment regarding her
defamation claim because there was a genuine issue of material fact as to
whether the alleged defamatory statements have a defamatory meaning.  Durckel=s
defamation claim is based on: (1) the Revenue Report prepared by Nettleton; and
(2) statements made by Brad Mitchell, the Hospital=s
Chief Operating Officer. 

            First,
Durckel claims that it is apparent that Nettleton
knowingly falsified the figures in the Revenue Report, thereby implying that Durckel was incapable of doing her job.  Second, Durckel
maintains Mitchell=s comments that Aa camera is missing@ and Ayou need to return it to the hospital@
clearly charged her with theft. 
Nettleton and the Hospital counter that the statements are not
defamatory, and even if they are, the qualified privilege applies.

Whether
an unambiguous statement is reasonably capable of defamatory meaning is a dispositive question of law.  Musser v. Smith Protective Servs.,
Inc., 723 S.W.2d 653, 655 (Tex. 1987). 
Statements that neither identify the plaintiff nor set forth any
wrongful conduct have no defamatory meaning.  Delta Airlines
v. Norris, 949 S.W.2d 422, 426 (Tex. App.CWaco
1997, pet. denied).  








A.  Revenue
Report

Durckel contends the Revenue Report Nettleton distributed at the June
meeting grossly understated the revenue and falsely represented the unprofitability of the television programs Durckel produced.  Durckel claims the Revenue Report suggests she was
incompetent or incapable of doing her job. 
Durckel also claims that this Revenue Report
caused her to be fired and hindered her abilities to find new employment.

Libel
is defined by statute as a Adefamation expressed in written or other graphic form that
tends to . . . injure a living person=s reputation and thereby expose the person to public hatred,
contempt or ridicule, or financial injury or to impeach any person=s
honesty, integrity, virtue, or reputation or to publish the natural defects of
anyone and thereby expose the person to public hatred, ridicule, or financial
injury.@
 Tex. Civ. Prac. & Rem. Code '
73.001.  In order to be libelous, a
statement must be capable of having a defamatory meaning.  See Musser, 723 S.W.2d
at 655.

In
a libel action, the trial court initially must determine, as a matter of law,
whether the words used are reasonably capable of defamatory meaning by
considering the alleged defamatory statement as a whole; the determination is
based upon how a person of ordinary intelligence would perceive the entire
statement.  Id.
at 654B55.  AThe question should not be submitted to the jury unless the
language is ambiguous or of doubtful import.@  Garcia v. Burris,
961 S.W.2d 603, 605 (Tex. App.CSan
Antonio 1997, pet. denied).  The
statements alleged to be defamatory must be viewed in their context; they may
be false, abusive, unpleasant, or objectionable to the plaintiff and still not
be defamatory in light of the surrounding circumstances.  San Antonio Express News v. Dracos, 922 S.W.2d 242, 248 (Tex. App.CSan
Antonio 1996, no writ).  








The
Revenue Report did not identify Durckel by name nor
could the revenue reflected in the Revenue Report reasonably be interpreted to
indicate that Durckel was not adequately performing
her job.  The Revenue Report is an
internal, informal accounting document that is expressly subject to a
significant qualification.  The Revenue
Report does not refer to Durckel or her job
performance in any way.  It merely states
that, based only on exact matches between CentraMax
and HBO, there was $69,210 in revenue for all television programs.  This statement as a whole is not reasonably
capable of a defamatory meaning because it says nothing about Durckel=s capabilities or job performance and because it would not be
reasonable to infer from this statement that Durckel
was incompetent or incapable of doing her job. 
See Huckabee v. Time Warner Entm=t Co., L.P., 19
S.W.3d 413, 429B30 (Tex. 2000) (holding that general statement about family
courts was not reasonably capable of a defamatory meaning as to the specific
family-court judge); Musser, 723 S.W.2d at 654B55
(holding that statement that claimant Awas able . . . to relieve us of certain of our polygraph
accounts@
was not reasonably capable of a defamatory meaning); Newspapers, Inc. v.
Matthews, 339 S.W.2d 890, 893 (Tex. 1960) (holding statements not
reasonably capable of defamatory meaning); Einhorn
v. LaChance, 823 S.W.2d 405, 411 (Tex.
App.CHouston
[1st Dist.] 1992, writ dism=d
w.o.j.) (holding that
statement that employee was fired based solely on work performance was
nonspecific and not reasonably capable of a defamatory meaning).  Therefore, the trial court did not err in
granting summary judgment as to Durckel=s
defamation claim regarding the Revenue Report. 

B.
Statements Made by Mitchell

Next,
Durckel complains of statements Mitchell made during
their meeting discussing both Durckel=s
termination and her rights under the Hospital=s integrity policy.  Durckel alleges that Mitchell accused her of theft.  During her deposition, Durckel
testified: 

Q: Okay. What did Brad Mitchell tell you during this meeting?

A:
He was very impatient, very abrupt. Had no interest in
listening to any integrity issue. 
Hardly had the time of day.  And he said that I had taken a camera from
the hospital, that I had violated Hospital policy and that I needed to return
the camera. 

Q: All right. 








A: I felt very violated. I felt accused of theft, and I felt very defamed.

Q: All right.  Now, he did not tell you that you had stolen
this cameraChe didn=t [sic] tell
you that, did he? 

A: His
specific words were a camera is missing.

Q: Uh-huh.

A: And you
need to return it to the hospital.

                                                                .
. .

Q: So
those words don=t include the words and we think you stole it, right? 

A: They
imply it fairly clearly I would say. 

                                                                .
. .

Q: But to your knowledge, no police report
was filed against you, to your knowledge, is that right? 

A: No. 

Q: Okay. And no one sent you any letters
saying we believe you=ve
stolen our equipment, please bring it back, did they? 

A: No. 

                                                                .
. .

Q: The charge of theft is something that
you=re implying, is
that correct, because no one ever charged you, no one ever put out a charge
against you of theft, did they?

A: No, not
a legal charge of theft. 

Q: Not even a chargeBa
report to yourB[sic]
in writing saying you have stolen our equipment, you are thief. There is
nothing like that in writing, is there? 

A: No,
there is not. 

Q: And he [Mitchell] never called you a
thief. He never said you are a thief, Ms. Durckel,
did he? 








A: He did
not say those words, no, he did not. 

                                                                .
. .

Q: Did Brad Mitchell publish a statement
labeling you a thief to anyone other than the conversation you and he had? 

A: Not to
my knowledge. 

As to Mitchell=s
statements, Durckel bases her defamation claim on his
alleged statements that Aa camera is missing@ and Ayou need to return it to the hospital.@  Mitchell knew Durckel
had taken a camera (Beta machine) and left a check for the amount which she
believed was its value.  Wanting the
Hospital=s
property back, Mitchell told Durckel that she needed
to return the missing camera.  Examining
Mitchell=s
statements as a whole and in their context, they do not imply Durckel is a thief or that she had stolen the camera.  Durckel had taken
the camera without permission, and the Hospital wanted it back.  Mitchell never called Durckel
a thief nor did he or any other member of the Hospital bring charges of theft
against Durckel. 
In fact, Durckel herself testified that Mitchell
never directly called her a thief and that the Hospital never reported that Durckel had stolen the camera or that she was a thief. 

Durckel also points to her affidavit, which states that AMitchell
accused [her] of theft@ and Adefamed [her] by publishing a charge that [she] was guilty of
theft in having taken a Beta machine.@  We do not consider the statements in Durckel=s affidavit because they are conclusory
statements that do not preclude the entry of summary judgment against her.  See Anderson
v. Snider, 808 S.W.2d 54, 55 (Tex.
1991); Dolcefino v. Randolph, 19 S.W.3d
906, 930 (Tex. App.CHouston [14th Dist.] 2000, pet. denied). 








To
prove a defamation claim, a plaintiff may use innuendo to explain the
statements. Schauer v. Memorial Care Sys.,
856 S.W.2d 437, 438 (Tex. App.CHouston [1st Dist.] 1993, no writ), disapproved on other
grounds by Huckabee v. Time Warner Entm=t Co., L.P., 19
S.W.3d 413, 415 (Tex. 2000).  Innuendo,
however, does not permit a plaintiff to change the meaning, extend the meaning,
or impose a strained construction on the words. 
ABC, Inc. v. Shanks, 1 S.W.3d 230, 236 (Tex. App.CCorpus Christi 1999, pet. denied).  If an ordinary person cannot ascribe the
defamatory meaning through innuendo, the words do not have a defamatory
meaning.  Simmons v. Ware,  920 S.W.2d 438, 451 (Tex. App.CAmarillo
1996, no writ).  Mitchell=s
statements are not reasonably capable of a defamatory meaning as to Durckel.  See Huckabee, 19 S.W.3d at 429B30;
Musser, 723 S.W.2d at 654B55; Einhorn, 823 S.W.2d
at 411.  Therefore, summary judgment on Durckel=s defamation claim was proper as a matter of law.  We overrule Durckel=s
second issue. 

V.  Intentional
Infliction of Emotional Distress Claim

In
her third issue, Durckel contends the trial court
erred in granting summary judgment on her claim for intentional infliction of
emotional distress.  Nettleton and the
Hospital contend the evidence establishes nothing more than an ordinary
employment dispute.  We agree with
Nettleton and the Hospital. 

An
employee may recover damages for intentional infliction of emotional distress
in an employment context as long as the employee establishes the elements of
this claim.  Wornick Co. v. Casas, 856 S.W.2d 732, 734 (Tex. 1993).  To recover damages for intentional infliction
of emotional distress, a plaintiff must prove: (1) the defendant acted
intentionally or recklessly; (2) the conduct was extreme and outrageous; (3)
the defendant=s actions caused the plaintiff emotional distress; and (4) the
resulting emotional distress was severe. 
Standard Fruit & Vegetable Co. v. Johnson,
985 S.W.2d 62, 65 (Tex. 1998).  In
addition, A[a] claim for intentional infliction of emotional distress
cannot be maintained when the risk that emotional distress will result is
merely incidental to the commission of some other tort.@  Id. at 68.  Accordingly, a claim for intentional
infliction of emotional distress will not lie if emotional distress is not the
intended or primary consequence of the defendant=s conduct.  Id.   








In
their motion for summary judgment, Nettleton and the Hospital contest their
liability for intentional infliction of emotional distress on the grounds that
the alleged actions forming the basis of the claim do not rise to the level
necessary to constitute extreme and outrageous conduct.  To be extreme and outrageous, conduct must be
Aso
outrageous in character, and so extreme in degree, as to go beyond all possible
bounds of decency, and to be regarded as atrocious, and utterly intolerable in
a civilized community.@  Natividad
v. Alexsis, Inc., 875 S.W.2d 695, 699 (Tex. 1994)
(quoting Twyman v. Twyman,
855 S.W.2d 619, 621 (Tex. 1993)). 








Texas
courts have adopted a strict approach to
intentional-infliction-of-emotional-distress claims arising in the
workplace.  See, e.g., Miller v.
Galveston/Houston Diocese, 911 S.W.2d 897, 900B01
(Tex. App.CAmarillo 1995, no writ); Amador v. Tan, 855 S.W.2d 131,
135 (Tex. App.CEl Paso 1993, writ denied); Horton v. Montgomery Ward &
Co., 827 S.W.2d 361, 369 (Tex. App.CSan Antonio 1992, writ denied) (holding that Aincidents
in which a Texas court has determined the conduct to be extreme and outrageous
in the employer/employee setting are few@); see also Johnson v. Merrell Dow Pharm.,
965 F.2d 31, 33 (5th Cir. 1992) (applying Texas law and affirming summary
judgment where claim was based on alleged course of harassing conduct
culminating in termination).  Underlying
these decisions is the sensible notion that to properly manage its business, an
employer must be able to supervise, review, criticize, demote, transfer, and
discipline employees.  See, e.g.,
Johnson, 965 F.2d at 34; Miller, 911 S.W.2d at 901; Diamond
Shamrock Ref. & Mktg. Co. v. Mendez, 809 S.W.2d 514, 522 (Tex. App.CSan
Antonio 1991), aff=d
in part and rev=d in part on other grounds,
844 S.W.2d 198 (Tex. 1992).  Given these
considerations, Texas courts have held that a claim for intentional infliction
of emotional distress does not lie for ordinary employment disputes.  Miller, 911 S.W.2d at 900‑01; see
also Johnson, 965 F.2d at 33.  The
range of behavior encompassed in Aemployment disputes@ is broad, and includes, at a minimum, such things as
criticism, lack of recognition, and low evaluations, which, although unpleasant
and sometimes unfair, are ordinarily expected in the work environment.  Johnson, 965 F.2d at 33B34;
see also Wilson v. Monarch Paper Co., 939 F.2d 1138, 1143 (5th Cir.
1991) (stating Athe facts of a given claim of outrageous conduct must be
analyzed in context@).  

Generally,
insensitive or even rude behavior does not constitute extreme and outrageous
conduct.  Natividad,
875 S.W.2d at 699.[3]  Similarly, mere insults, indignities,
threats, annoyances, petty oppressions, or other trivialities do not rise to
the level of extreme and outrageous conduct. 
Porterfield v. Galen Hosp. Corp., 948 S.W.2d 916, 920 (Tex. App.CSan Antonio 1997, writ denied). 
Thus, to establish a claim for intentional infliction of emotional
distress in the workplace, an employee must prove the existence of some conduct
that brings the dispute outside the scope of an ordinary employment dispute and
into the realm of extreme and outrageous behavior.  Ramirez v. Allright
Parking El Paso, Inc., 970 F.2d 1372, 1376 (5th Cir. 1992) (requiring
employee to show conduct Aelevating [the employer=s] actions above those involved in an >ordinary
employment dispute=@).[4]  








The
Texas Supreme Court=s opinion in GTE Southwest, Inc. v. Bruce is
particularly instructive.  998 S.W.2d 605 (Tex. 1999). 
In that case, the Texas Supreme Court evaluated conduct that was alleged
to constitute intentional infliction of emotional distress occurring in an
employment context.  Id.
at 609.  Though holding that
evidence of a supervisor=s conduct was legally sufficient to support the jury=s
finding of intentional infliction of emotional distress, the Texas Supreme
Court cautioned that this tort Adoes not lie for ordinary employment disputes,@
and that extreme and outrageous conduct in the employment context Aexists
only in the most unusual of circumstances.@  Id.
at 612B13.  An employer must have latitude to exercise
its rights to supervise and criticize, in a permissible way, even though
emotional distress may result.  Id.   

Accordingly,
in order to prove her claim, Durckel had to show the
existence of some conduct that brings an ordinary employment dispute into the
realm of extreme and outrageous behavior.  See id. at
613.  She failed to do so.  The alleged conduct in this case does not
constitute extreme and outrageous behavior. 
Neither the Revenue Report nor Mitchell=s statements rise to a level beyond that of an ordinary
workplace dispute.  Durckel
failed to present evidence raising a genuine issue of material fact on whether
the alleged conduct was extreme and outrageous. 
Because we find Nettleton and the Hospital negated the second element of
Durckel=s claim for intentional infliction of emotional distress C
that the conduct was extreme and outrageous C summary judgment on this claim was proper.  See Science
Spectrum, 941 S.W.2d at 951.  We
overrule Durckel=s third issue.

VI. 
Punitive Damages 








In
her fourth issue, Durckel contends the trial court
erred in granting summary judgment on her claim for punitive damages.  Durckel maintains
that punitive damages are appropriate when an employer discriminates Ain
the face of a perceived risk that its actions will violate . . . law.@  See Kolstad v.
American Dental Ass=n, 527
U.S. 526, 539 (1999).  Because Nettleton
and the Hospital proved they were entitled to judgment as a matter of law on Durckel=s claims for breach of contract/wrongful termination,
defamation, and intentional infliction of emotional distress, we find that
summary judgment was also proper on Durckel=s
claim for punitive damages.  See Twin
City Fire Ins. Co. v. Davis, 904 S.W.2d 663, 665 (Tex. 1995)
(plaintiffs cannot recover punitive damages unless they first recover under an
independent tort claim).  Accordingly, we
overrule Durckel=s fourth issue.

We
affirm the trial court=s judgment.

 

/s/        Kem Thompson Frost

                                                            Justice

 

 

Judgment rendered and Opinion filed May 9,
2002.

Panel consists of Justices Anderson,
Hudson, and Frost.

Publish C Tex. R.
App. P. 47.3(b).

 











[1]   It might seem
unusual that this meeting occurred in June of 1997, given that the Revenue
Report contained data for a time period that ended on June 30, 1997.  In fact, Durckel
testified at her deposition that she did not know if this meeting actually
occurred in June of 1997.  Nonetheless, Durckel=s affidavit states that this meeting occurred in June
of 1997.  The exact timing of the meeting
is not material to the issues presented in this appeal.





[2]  Although
Mitchell used the term Acamera@ to describe the missing property, it is clear from
the record that both he and Durckel knew he was
referring to the Hospital=s Beta machine. 





[3]  See, e.g.,
Diamond Shamrock Ref. & Mktg. Co. v. Mendez, 844 S.W.2d 198 (Tex. 1992)
(stating conduct of employer who wrongfully accused plaintiff of thievery and
fired him was not extreme and outrageous conduct); Porterfield v. Galen
Hosp. Corp., 948 S.W.2d 916 (Tex. App.CSan
Antonio 1997, writ denied) (holding verbal abuse, refusal to allow plaintiff
lunch breaks, and hostile demonstrations when plaintiff left work sick was not
extreme and outrageous conduct);  Beiser v. Tomball Hosp. Auth., 902 S.W.2d 721
(Tex. App.CHouston [1st Dist.] 1995, writ denied) (stating
termination in violation of a whistleblower statute was not in itself extreme
and outrageous conduct); Garcia v. Andrews, 867 S.W.2d 409 (Tex. App.CCorpus Christi 1993, no writ) (holding conduct of
manager who made sexually suggestive and embarrassing remarks to plaintiff and
mentally undressed her, was not extreme and outrageous); Horton, 827
S.W.2d at 361 (holding conduct of co‑worker who cursed at plaintiff,
committed assault and battery, hit her with a wad of paper, placed rattlesnake
rattlers in her desk, and defaced her pictures was not extreme and outrageous).





[4]  In Dean v.
Ford Motor Credit Co., 885 F.2d 300, 307 (5th Cir. 1989), the court
recognized that the supervisor=s act of placing checks in the employee=s purse to make it appear that she was a thief and to
put her in fear of criminal prosecution was extreme and outrageous.  In addition, in Wilson v. Monarch Paper
Co., 939 F.2d 1138, 1145 (5th Cir. 1991), the court found extreme and
outrageous  the employer=s intentional and systematic actions to humiliate the
plaintiff, a long‑time executive with a college education and thirty
years= experience, by requiring him to do menial janitorial
duties.  See Wilson, 939 F.2d at
1145; but see  Saucedo v. Rheem Mfg. Co., 974 S.W.2d 117, 124 (Tex. App.CSan Antonio 1998, pet. denied) (holding that
supervisor swearing at employee, calling him obscene names, insulting and
threatening to fire employee, and blaming employee for supervisor=s mistakes did not rise to the level of extreme and
outrageous).