

# IN THE
# TENTH COURT OF APPEALS

### No. 10-11-00257-CV

**MERARI GONZALEZ,**

                                               **Appellant**

 **v.**

**METHODIST CHARLTON MEDICAL CENTER,**

                                               **Appellee**

---

**From the 413th District Court
Johnson County, Texas
Trial Court No. C201000199**

---

## MEMORANDUM OPINION

---

In this appeal, appellant, Merari Gonzalez, challenges a summary judgment granted in favor of appellee, Methodist Charlton Medical Center ("Methodist"). In four issues, Gonzalez contends that: (1) genuine issues of material fact exist as to her breach-of-contract and wrongful-termination claims; (2) the trial court improperly disposed of her non-employment breach-of-contract claim; (3) Methodist failed to conclusively prove that it is entitled to a qualified privilege with respect to her defamation claim; and

(4) Methodist's alleged defamatory communications were made with actual malice. We affirm.

## I. BACKGROUND

In August 2005, Gonzalez enrolled in the Diagnostic Medical Sonography Program at El Centro Community College ("El Centro") in Dallas, Texas. As a part of the program, Gonzalez was required to do clinical rotations at various hospitals. El Centro had a long-standing relationship with Methodist, whereby El Centro students would enter into tuition agreements with Methodist in exchange for working rotations at the hospital. Gonzalez and Methodist entered into such an agreement.

The agreement between Gonzalez and Methodist provided that Methodist would pay Gonzalez's tuition at El Centro up to $6,750, her registration fees, and a book allowance of $500. In exchange, Gonzalez agreed to remain in the full-time employment of Methodist for twenty-four months following her graduation from El Centro, among other things. Despite the requirement that Gonzalez work for Methodist for two years after her graduation, the agreement specifically stated the following:

> 3.0  Disclaimer of Contractual Employment
>
> Nothing in this agreement overrides the general conditions of employment of Employee by MHS or MCMC. Specifically, this Agreement does not guarantee that Employee will continue to have employment with MHS or MCMC for twenty-four months or any other length of time after graduation from the Program. Employee remains an "at will" employee of MHS and MCMC.

Gonzalez was hired into Methodist's Ultrasound Department on September 8, 2008, as a Radiology Extern. In this position, Gonzalez reported directly to Shannon

Holmgren. According to Methodist, the tuition agreement between it and Gonzalez was unrelated to Gonzalez's employment as a Radiology Extern or, in other words, the tuition agreement did not constitute a contract for employment. In fact, Mary Ellen Humphreys, the Director of Radiology at Methodist, executed an affidavit in which she stated that:

> Students, such as Gonzalez, performed clinical rotations in sonography at Methodist as part of their curriculum at El Centro. Gonzalez performed similar functions during her clinical rotation at Methodist as she did as a Radiology Extern. Gonzalez was simultaneously an employee of Methodist and an El Centro student during the time period she was employed by us. The work she did during her rotation at our facility was, however, in a different capacity from her work as a Radiology Extern.

In her appellate brief, Gonzalez acknowledges that her "duties as a Radiology Extern were essentially the same as her duties during clinical rotations, except that her clinical rotations were during the week, while her Radiology-Extern work was during 10-hour shifts on Saturdays."

Gonzalez participated in a new-employee orientation at Methodist on September 8, 2008. During this orientation, Gonzalez received training on the Health Insurance Portability and Accountability Act ("HIPAA"). Gonzalez admitted in her deposition that she received additional HIPAA training at El Centro.

On September 10, 2008, Gonzalez began the first day of her six-week clinical rotation at Methodist. The rotations ended on or about October 20, 2008. However, at some point in October 2008, Gonzalez asked Holmgren if she could burn a CD of a patient exam to present to her class at El Centro. According to Gonzalez,

El Centro requires its sonography students to acquire sonography cases from hospitals at which they study and/or work, including MCMC. El Centro instructed its sonography students, including Gonzalez, to obtain cases in a digital format on CD. The participating hospitals, including all Methodist hospitals, were made aware of this process.

In her affidavit, Holmgren averred that she did not allow Gonzalez to burn a CD of a patient exam for presentation to her class because Methodist "could not remove the patient information from the CD." Holmgren agreed "to print [Gonzalez] hard copies of the films that she wanted, but she would have to remove the patient identifiers from the films before taking them off Methodist's premises." Holmgren further asserted that Gonzalez argued with her about this policy, which prompted Holmgren to confirm the policy with Humphreys. According to Holmgren, after further discussion, she told Gonzalez that "[i]f [Gonzalez] wanted the patient study, she would need to have film printed from the Picture Archiving and Communications System ("PACS") and remove all patient identifiers from the film before removing from Methodist['s] premises."

However, on November 22, 2008, Gonzalez, working under the supervision of sonographer Beji Pappachen, obtained a CD of an examination of a hospital patient. According to Holmgren, "Gonzalez removed the CD without asking for [her] permission, nor did [Gonzalez] have the permission of the patient to take the information." Gonzalez, on the other hand, asserted that Pappachen told her that she could have a copy of the case on CD and instructed her to speak with Sonia Franco, another Methodist employee, to get a copy made. Gonzalez alleged that Franco created the CD and gave it to Pappachen to give to Gonzalez when her shift was over. In her affidavit, Gonzalez stated that "Pappachen told [her] that he had the CD and that [she]

should come and pick it up so it doesn't get lost." Gonzalez complied with Pappachen's instructions and "took the CD, which was in a CD envelope cover, and put it away." Gonzalez contends that she was not present when the CD was made and, thus, was unaware if the CD contained any patient-identifying information that would constitute a breach of confidential information or a violation of HIPAA.

Holmgren found out the next day that Gonzalez had obtained the CD and instructed her to return it immediately. Holmgren alleged that Gonzalez "had not followed the procedure permitting her to remove patient studies that I had previously outlined for her. Gonzalez removed the CD without asking for my permission, nor did she have the permission of the patient to take the information." Gonzalez was informed that the taking of the CD constituted a potential HIPAA violation. In her affidavit, Gonzalez asserted that: "I immediately returned the CD. I did not open it, show the CD envelope or its contents to anyone, or in any other way examine its contents or reveal them to anyone else. I did not breach confidential information."

After retrieving the CD, Holmgren informed her supervisor, Humphreys, about the incident. Humphreys called Jan Blend, the Clinical Program Director at El Centro, to inquire whether students were instructed about HIPAA. Blend provided Humphreys with an email detailing El Centro's policies and instructions to students regarding the protection of patients' confidentiality. Humphreys then contacted: (1) Pam McNutt, Methodist's Chief Information Officer, to determine whether Gonzalez's actions amounted to a HIPAA violation; and (2) Keri Frazier-White, Methodist's

Director of Human Resources, for additional guidance. Ultimately, it was decided that Gonzalez's employment should be terminated.

In terminating Gonzalez, Frazier-White completed a Personnel Action Form documenting the incident. Frazier-White indicated that Gonzalez's action of obtaining the CD constituted a breach of confidential information. The form also required Frazier-White to enter a code corresponding with the reason for termination. According to Frazier-White, the codes were compiled by GroupOne Services. The information contained in the form was then electronically communicated to Methodist's payroll department and then to GroupOne. Frazier-White noted that:

> Methodist routinely supplies GroupOne Services with employee termination information and also accesses GroupOne Services' information bank for information when hiring prospective employees. This system exists to allow us to ascertain reference information as well as criminal background information on prospective employees and to provide information concerning Methodist termination decisions for the benefit of other hospitals that subscribe to GroupOne Services. Only subscribing hospitals can obtain this information through a public request. Communications concerning termination decisions that are reported to and obtained from GroupOne [S]ervices serve the interests of Methodist and other subscribing hospitals in ensuring that new hires are qualified and suited for their prospective positions and will not constitute a danger to patients and others.

Subsequently, on December 11, 2008, Gonzalez filed a grievance regarding her termination. The grievance committee upheld the termination decision, though one committee member allegedly told Blend, who accompanied Gonzalez but did not participate in the grievance proceedings, that she did not believe that Gonzalez had breached confidential information or violated HIPAA.

On April 21, 2010, Gonzalez filed suit against Methodist, asserting causes of action for libel, slander, breach of contract, and wrongful discharge. Gonzalez also pleaded for exemplary damages, contending that Methodist's conduct in terminating her and disclosing the termination to GroupOne was "willful and malicious."

Methodist responded by filing a general answer denying all of the allegations contained in Gonzalez's original petition. Methodist later filed traditional and no-evidence motions for partial summary judgment. In its traditional-summary-judgment motion, Methodist challenged Gonzalez's libel and slander claims by arguing that "there is no dispute of material fact that Defendant's statements concerning Plaintiff were made without malice and were qualifiedly privileged." In its no-evidence-summary-judgment motion, Methodist attacked Gonzalez's breach-of-contract and wrongful-termination claims. With respect to Gonzalez's breach-of-contract claim, Methodist specifically argued that the record contains no evidence: (1) "of an enforceable employment contract that limited Methodist's right to discharge the Plaintiff at will"; (2) "that Methodist breached the contract by wrongfully discharging Plaintiff"; and (3) "that Methodist's breach caused the Plaintiff injury." Regarding Gonzalez's wrongful-termination claim, Methodist contended that the record contains no evidence that Gonzalez's discharge: (1) "was unlawfully motivated by any statutorily protected status"; and (2) "violated the common[-]law exception to the at-will doctrine."

Gonzalez filed responses to both of Methodist's summary judgment motions. In her response to Methodist's no-evidence-summary-judgment motion, Gonzalez

attached, among other things, her affidavit, an affidavit executed by Blend, and several excerpts from deposition testimony given by Frazier-White and Humphreys.

Methodist filed numerous objections to the affidavits of Blend and Gonzalez. The record does not include a specific order ruling on Methodist's objections. Nevertheless, after a hearing, the trial court granted Methodist's traditional and no-evidence summary judgment motions "in all things." And, in the order, the trial court specifically noted that: (1) Gonzalez "shall recover nothing of or from Defendant and Defendant shall recover its costs of court from Plaintiff"; and (2) the "Judgment finally disposes of all parties and claims and is appealable." This appeal followed.

## II.   SUMMARY JUDGMENTS

Different standards of review apply to summary judgments granted on no-evidence and traditional grounds. *See* TEX. R. CIV. P. 166a(c), (i). A no-evidence summary judgment is equivalent to a pre-trial directed verdict, and we apply the same legal sufficiency standard on review. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). Once an appropriate no-evidence motion for summary judgment is filed, the non-movant, here Gonzalez, must produce summary judgment evidence raising a genuine issue of material fact to defeat the summary judgment. *See* TEX. R. CIV. P. 166a(i). "A genuine issue of material fact exists if more than a scintilla of evidence establishing the existence of the challenged element is produced." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). We do not consider any evidence presented by the movant unless it creates a fact question. *Binur v. Jacobo*, 135 S.W.3d 646, 651 (Tex. 2004).

"Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion of fact.'" *Ortega v. City Nat'l Bank*, 97 S.W.3d 765, 772 (Tex. App.—Corpus Christi 2003, no pet.) (op. on reh'g) (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)). Conversely, more than a scintilla exists when the evidence "raises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Id.* (citing *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex. 1994)). In determining whether the non-movant has met her burden, we review the evidence in the light most favorable to the non-movant, crediting such evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *Tamez*, 206 S.W.3d at 582; *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005).

In contrast, we review the trial court's grant of a traditional motion for summary judgment de novo. *See Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). When reviewing a traditional motion for summary judgment, we must determine whether the movant met its burden to establish that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. *See* Tex. R. Civ. P. 166a(c); *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002). The movant bears the burden of proof in a traditional motion for summary judgment, and all doubts about the existence of a genuine issue of material fact are resolved against the movant. *See Grant*, 73 S.W.3d at 215. We take as true all evidence favorable to the non-movant, and we indulge every reasonable inference and resolve any doubts in the non-movant's favor. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). We

will affirm a traditional summary judgment only if the record establishes that the movant has conclusively proved its defense as a matter of law or if the movant has negated at least one essential element of the plaintiff's cause of action. *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004); *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 425 (Tex. 1997).

Here, Methodist filed separate traditional and no-evidence motions for partial summary judgment. In its no-evidence motion, Methodist advanced several grounds supporting summary judgment as to Gonzalez's breach-of-contract and wrongful-termination claims. When the trial court's judgment does not specify which of several grounds proposed was dispositive, we affirm on any ground offered that has merit and was preserved for review. *See Joe v. Two Thirty Nine J.V.*, 145 S.W.3d 150, 157 (Tex. 2004). Moreover, when a party moves for summary judgment under both rules 166a(c) and 166a(i), "[we] first review the trial court's summary judgment under the standards of rule 166a(i)." *Ridgway*, 135 S.W.3d at 600.

### III.   METHODIST'S NO-EVIDENCE MOTION FOR PARTIAL SUMMARY JUDGMENT

In her first two issues, Gonzalez contends that the trial court erred in granting Methodist's no-evidence motion for summary judgment with respect to her wrongful termination and breach of contract causes of action because material fact issues exist. Specifically, Gonzalez asserts that: (1) the tuition agreement "makes specific and express modifications of at-will employment, including a defined duration of employment, explicit restrictions on the rights of the parties to end employment without cause, the requirement to forfeit thousands of dollars for early termination, and

a requirement to give 30-days prior written notice of termination"; (2) Methodist breached the tuition agreement by failing to provide the required written notice and by failing to pay her amounts owed under the agreement; (3) Methodist knew that she did not breach any confidential information or commit any misconduct prompting her termination; and (4) she suffered damages from lost wages and payments owed under the agreement. Methodist counters that the tuition agreement is not an employment contract and does not modify the at-will employment relationship between it and Gonzalez. Methodist further argues that Gonzalez's evidence fails to raise a fact issue regarding any limitations on Methodist's right to terminate Gonzalez.

## A. Applicable Law

Texas follows the rule of at-will employment, under which employment for an indefinite term may be terminated at will and without cause. *Schroeder v. Tex. Iron Works, Inc.*, 813 S.W.2d 483, 489 (Tex. 1991). A Texas employer may fire an employee at will for good cause, bad cause, or no cause at all. *Montgomery County Hosp. Dist. v. Brown*, 965 S.W.2d 501, 502 (Tex. 1998). Under Texas law, we presume that Gonzalez remained an at-will employee throughout her employment with Methodist. *See Fed. Express Corp. v. Dutschmann*, 846 S.W.2d 282, 283 (Tex. 1993). Gonzalez must prove that Methodist expressly, clearly, and specifically agreed to modify her at-will status. *See Brown*, 965 S.W.2d at 503; *see also Durckel v. St. Joseph Hosp.*, 78 S.W.3d 576, 581 (Tex. App.—Houston [14th Dist.] 2002, no pet.). To modify the at-will employment relationship, an employer must unequivocally manifest a definite intent to be bound not

to terminate an employee except under clearly specified circumstances. *Midland Judicial Dist. Cmty. Supervision & Corr. Dep't v. Jones*, 92 S.W.3d 486, 487 (Tex. 2002) (per curiam).

An employment contract for a term may still be at will if the agreement allows termination for any reason. *C.S.C.S., Inc. v. Carter*, 129 S.W.3d 584, 591 (Tex. App.—Dallas 2003, no pet.); *Curtis v. Ziff Energy Group, Ltd.*, 12 S.W.3d 114, 118 (Tex. App.—Houston [14th Dist.] 1999, no pet.). An employee's subjective understanding—that her employment may only be terminated for cause or that her employment is for a term—does not create a contract. *Ed Rachal Found. v. D'Unger*, 207 S.W.3d 330, 332 (Tex. 2006) (per curiam) (rejecting an at-will employee's personal understanding that his contract was for a renewable one-year term); *Matagorda County Hosp. Dist. v. Burwell*, 189 S.W.3d 738, 740 (Tex. 2006) (per curiam) (rejecting an at-will employee's understanding based on an employment handbook that she could only be terminated for cause). In the usual case, the contract alone will be deemed to express the intention of the parties because it is the objective, not subjective, intent that controls. *Burwell*, 189 S.W.3d at 740.

The elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance, or tendered performance, by the claimant; (3) breach of the contract by the defendant; and (4) damages to the plaintiff resulting from that breach. *Abraxas Petroleum Corp. v. Hornburg*, 20 S.W.3d 741, 758 (Tex. App.—El Paso 2000, no pet.).

**B. Wrongful Termination**

In order to establish a wrongful-termination claim based on a written contract of employment, such as exists here, Gonzalez must prove that her contract specifically

limited Methodist's right to terminate her at will. *Brown*, 965 S.W.2d at 505. On appeal,

Gonzalez points to several provisions in the agreement, which allegedly modify the at-

will employment doctrine. She first asserts that the contract contemplated a defined

duration of employment—Methodist agreed to pay up to $6,750 in tuition costs,

registration fees, and $500 in books for one academic year in exchange for her

agreement to work for Methodist for twenty-four months after her graduation from El

Centro. She also argues that the following language contained in the contract restricted

Methodist's ability to terminate her without cause:

> 2.4  In the event that Employee [Gonzalez] leaves employment because MHS terminates Employee's employment during the twenty-four months following Graduation for reasons other than those set forth in Section 2.3[1], Employee shall have no obligation to repay the cost of the financial assistance. The parties agree that temporary periods during which no work is available do not constitute termination of Employee's employment.

Essentially, Gonzalez argues that the tuition agreement placed a restriction on

Methodist's ability to terminate her without cause because Methodist was required to

---

[1] Section 2.3 of the tuition agreement provides that:

2.3  Employee agrees that he/she will remain in the full-time employment of MCMC starting on the Effective Date and lasting for a period of twenty-four months following Graduation. In the event Employee leaves MHS's employment under the circumstances set forth in this Section 2.3, before the expiration of twelve months following Graduation, Employee will repay MCMC the full amount of all financial assistance, fees[,] and allowances paid by MCMC in accord with Section 1.1 A above as well as any costs incurred by MCMC for providing training (collectively the "Repayment Amount"). If Employee leaves MHS's employment under the circumstances set forth in this Section 2.3, after the expiration of twelve months following Graduation, but before the expiration of twenty-four months following Graduation, Employee will repay one half the cost of the Repayment Amount. It is expressly understood and agreed that Employee's repayment obligations set out in this Section 2.3 shall be triggered if Employee's leaving employment at MHS is in any way based on, in whole or part, General Misconduct or Major Misconduct (as defined in the MHS Employee Handbook), or, for health reasons (except as limited by Section 2.5),or, Employee's voluntarily [sic] resignation.

forfeit the amounts paid to her under section 2.3.  Gonzalez also argues that the tuition agreement limited:  (1) Methodist's right to terminate her without cause when "there is a temporary period when no work is available"; and (2) her right to resign because it required the repayment of some or all of the wages earned if the resignation took place before the end of the contract term.  Additionally, Gonzalez contends that the tuition agreement altered the at-will employment relationship by requiring:  (1) special training and instruction; (2) Methodist to provide specific payments for one year; and (3) Methodist to provide notice before terminating her employment.

In analyzing these issues, we must examine the language of the tuition agreement to determine the intent of the parties.  *See Burwell*, 189 S.W.3d at 740.  In construing a written agreement, we must ascertain and give effect to the parties' intentions as expressed in the agreement.  *Frost Nat'l Bank v. L&F Distribs., Ltd.*, 165 S.W.3d 310, 311-12 (Tex. 2005) (per curiam); *Carbona v. CH Med., Inc.*, 266 S.W.3d 675, 680 (Tex. App.—Dallas 2008, no pet.).  We discern intent from the agreement itself, and the agreement must be enforced as written.  *Deep Nines, Inc. v. McAfee, Inc.*, 246 S.W.3d 842, 846 (Tex. App.—Dallas 2008, no pet.).  We consider the entire writing and attempt to harmonize and give effect to all the provisions of the contract by analyzing the provisions with reference to the whole agreement.  *Frost Nat'l Bank*, 165 S.W.3d at 312.  This consideration comes "'from a utilitarian standpoint bearing in mind the particular business activity sought to be served,'" and we will "'avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive.'"  *Id.* (quoting *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987)).

Whether an agreement is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances existing at the time the contract was entered. *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983); *Ganske v. Spence*, 129 S.W.3d 701, 707 (Tex. App.—Waco 2004, no pet.). An ambiguity does not arise simply because the parties interpret the contract differently. *Seagull Energy E & P, Inc. v. Eland Energy*, 207 S.W.3d 342, 345 (Tex. 2006); *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 861 (Tex. 2000). A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation. *Eland Energy*, 207 S.W.3d at 345. If the agreement can be given a certain or definite legal meaning or interpretation, it is not ambiguous, and we will construe it as a matter of law. *Coker*, 650 S.W.2d at 393. Moreover, a court will not change a contract merely because the court or one of the parties comes to dislike its provisions or thinks that something else is needed. *Calpine Producer Servs., L.P. v. Wiser Oil Co.*, 169 S.W.3d 783, 787 (Tex. App.—Dallas 2005, no pet.).

Implicit in the trial court's granting of Methodist's no-evidence motion for partial summary judgment is a finding that the tuition agreement is not ambiguous; we likewise agree that it is not.[2] Therefore, we construe the agreement's meaning as a question of law. *Id.* at 394; *see J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003).

---

[2] In a footnote, Gonzalez contends that because her interpretation of the tuition agreement differs from that of Methodist's, the agreement is ambiguous. However, as noted earlier, an ambiguity does not arise simply because the parties interpret the contract differently. *Seagull Energy E & P, Inc. v. Eland Energy*, 207 S.W.3d 342, 345 (Tex. 2006); *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 861 (Tex. 2000). Nevertheless, in her reply brief, Gonzalez agrees that the tuition agreement is not ambiguous.

Based on our reading of the tuition agreement, we do not believe that it constitutes an employment contract which altered or modified the at-will relationship between Gonzalez and Methodist. Our conclusion is supported by section 3.0 of the tuition agreement, which provided the following:

3.0 Disclaimer of Contractual Employment

Nothing in this agreement overrides the general conditions of employment of Employee by MHS or MCMC. Specifically, this Agreement does not guarantee that Employee will continue to have employment with MHS or MCMC for twenty-four months or any other length of time after graduation from the Program. Employee remains an "at will" employee of MHS and MCMC.

This language clearly states that Gonzalez was an at-will employee of Methodist and did not guarantee that Gonzalez would remain employed by Methodist for any specified period of time. In fact, this language allows for Methodist to terminate Gonzalez at any time with or without cause, which is consistent with the at-will employment doctrine. *See Brown*, 965 S.W.2d at 502. Moreover, to the extent that Gonzalez asserts that the tuition agreement created a right to wages, we note that nowhere in the tuition agreement are wages stated. *See, e.g., D'Unger*, 207 S.W.3d at 332 ("Standing alone, an agreement to pay at a stated rate is not enough [to alter the at-will employment relationship]; if it were, there would be very few at-will employees."). Though Methodist agreed to contribute to Gonzalez's tuition and schooling, the agreement does not address the usual characteristics of employment contracts— whether Gonzalez earned hourly wages or was a salaried employee or indicated how many hours per week she was required to work in order to comply with the terms of

the agreement. In interpreting the contract, Gonzalez essentially relies on certain provisions of the agreement and analyzes them in isolation; however, we are charged with harmonizing the entire contract and giving effect to all the provisions of the contract. *See Frost Nat'l Bank*, 165 S.W.3d at 312.

In addition, Gonzalez directs us to, among other things, portions of testimony given by Frazier-White and Blend, which, according to Gonzalez, create a fact issue as to whether the tuition agreement altered or modified the at will relationship. Specifically, in her affidavit, Blend averred that:

> I worked with MCMC to create a program for employment whereby MCMC would enter a contract with certain qualifying El Centro students as Radiology Externs. As part of those contracts, the student employees would agree to work for MCMC through graduation and continuing for two years. In exchange, MCMC would provide continued employment and training during the contract term and would pay the student employee's tuition and other various education costs. . . . One of the goals of this special employment program was to secure post-graduate employment for those eligible students and to enable MCMC to create and solidify a valuable relationship between the employee and the Hospital at the beginning of the employee's career—while he/she was still a student.

Gonzalez also relies on the following statements from Frazier-White's deposition:

> Q: For at-will employees, are you required to give them any notice before firing them?
>
> A: No.
>
> . . . .
>
> Q: Will you read Section 4.4?
>
> A: Um-hum. "MCMC may terminate this Agreement at any time, without cause, by giving Employee thirty days prior written notice."
>
> . . . .

Q: So that notice would apply to only somebody with this contract—

A: Correct.

Q: —an employee with this contract?

A: Right.

Based on this testimony, Gonzalez alleges that the record contains more than a scintilla of evidence demonstrating that the at-will employment relationship between her and Methodist was modified in a meaningful and special way. We disagree. First, Blend's statements that Methodist was required to provide students with continued employment in exchange for tuition reimbursement contradict the express terms of the tuition agreement, which did not guarantee employment for Gonzalez; and perhaps more importantly, we are not allowed to rely on parol evidence to ascertain the meaning of an unambiguous agreement. *See Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) ("Parol evidence is not admissible for the purpose of creating an ambiguity. Only where a contract is first determined to be ambiguous may the courts consider the parties' interpretation . . . and admit extraneous evidence to determine the true meaning of the instrument."). Gonzalez also relies on section 4.4 of the agreement to show that the at-will relationship was altered. We disagree with Gonzalez's interpretation of section 4.4.

Section 4.4 states that: "MCMC may terminate this Agreement at any time, without cause, by giving Employee thirty (30) days prior written notice." Based on our review of the agreement, section 4.4 only references the termination of the tuition

agreement itself, whereas another provision in that same section of the agreement, section 4.2, specifically mentions the duties of each party in the event that Gonzalez's employment is terminated.[3] This difference supports an interpretation that section 4.4 did not apply to the termination of Gonzalez's employment with Methodist; thus, we do not find Gonzalez's argument that section 4.4 of the agreement modified the at-will employment relationship in a meaningful way to be persuasive.

Harmonizing all of the provisions of the tuition agreement so that none are rendered superfluous, we cannot say that the agreement unequivocally manifested a definite intent on behalf of Methodist to modify or alter the at-will employment relationship between it and Gonzalez in a meaningful or special way. *See Jones*, 92 S.W.3d at 487; *see also El Expreso, Inc. v. Zendejas*, 193 S.W.3d 590, 594 (Tex. App.—Houston [1st Dist.] 2006, no pet.) ("[The] agreement to modify the at-will employment relationship must be '(1) expressed, rather than implied, and (2) clear and specific.'") (quoting *Miksch v. Exxon Corp.*, 979 S.W.2d 700, 703 (Tex. App.—Houston [14th Dist.] 1998, pet. denied)); *Durckel*, 78 S.W.3d at 582 ("General statements about working conditions, disciplinary procedures, or termination rights are not sufficient to change the at-will employment relationship; rather the employer must expressly, clearly, and specifically agree to modify the employee's at-will status."). As such, we conclude that Gonzalez has not met her burden in submitting a record with more than a scintilla of evidence proving that the presumed at-will relationship was altered. *See Durckel*, 78

---

[3] Section 4.2 of the tuition agreement specifically provides that: "MCMC's obligations under this Agreement shall terminate automatically in the event that . . . Employee's employment with MHS is terminated."

S.W.3d at  581 (citing *Hussong v. Schwan's Sales Enters.*, 896 S.W.2d 320, 323 (Tex. App.—Houston [1st Dist.] 1995, no writ)) (stating that it is the employee's burden to prove that the presumed at-will employment relationship was altered).  We further conclude that the trial court did not err in granting Methodist's no-evidence motion for partial summary judgment as to Gonzalez's wrongful-termination claim because she was an at-will employee as a matter of law.  *See Brown*, 965 S.W.2d at 502-05; *see also Durckel*, 78 S.W.3d at 583.

## C.  Breach of Contract

With respect to her breach-of-contract claim, Gonzalez asserts that Methodist breached the tuition agreement by terminating her without giving her notice.  In making this argument, Gonzalez relies exclusively on section 4.4 of the tuition agreement.  Methodist contends that the notice requirement contained in the tuition agreement only required Methodist to give notice "before ceasing payment of Appellant's tuition."  Methodist also argues that the tuition agreement did not require it to give notice before terminating Gonzalez because the tuition agreement does not govern Gonzalez's employment and because Gonzalez was an at-will employee.

As mentioned above, section 4.2 of the tuition agreement provides that: "MCMC's obligations under this Agreement shall terminate automatically in the event that . . . Employee's employment with MHS is terminated."  And in her appellate brief, Gonzalez states that "Methodist could immediately terminate Gonzalez only if Gonzalez committed General Misconduct or Major Misconduct as specifically defined by the handbook . . . ."

Here, Methodist terminated Gonzalez's employment based on the premise that she breached confidential information, violated HIPAA, and violated Policy 159 contained in the Methodist Employee Handbook, all of which Humphreys characterized as major misconduct.[4] Because Methodist terminated Gonzalez's employment, section 4.2 of the tuition agreement extinguished all of Methodist's obligations under the agreement, including the notice provision. And as mentioned above, section 4.4 only references the termination of the tuition agreement itself, whereas section 4.2 specifically mentions the termination of Gonzalez's employment. This difference supports an interpretation that section 4.4 did not apply to the termination of Gonzalez's employment with Methodist.

Because Methodist terminated Gonzalez, an at-will employee, and because section 4.2 of the tuition agreement extinguished all of Methodist's duties towards Gonzalez once her employment was terminated, Methodist was not required to comply with the section 4.4 notice provision. And, because the circumstances did not require that Methodist comply with the section 4.4 notice provision, we cannot say that Gonzalez satisfied her summary-judgment burden of demonstrating that Methodist breached the tuition agreement by failing to provide her with thirty days' notice of her termination. *See Hornburg*, 20 S.W.3d at 758; *see also* TEX. R. CIV. P. 166a(i). Accordingly, we conclude that the trial court correctly granted summary judgment in favor of

---

[4] On appeal, Gonzalez argues that the "evidence clearly shows that [she] did not breach confidential information or commit misconduct." In support of this contention, Gonzalez cites her own affidavit and the affidavit of Blend, the El Centro coordinator. However, because we have concluded that Gonzalez was an at-will employee of Methodist and could have been terminated without cause, whether she breached confidential information and violated HIPAA and Policy 159 of the Methodist Employee Handbook is irrelevant for purposes of analyzing her breach-of-contract claim.

Methodist with respect to Gonzalez's breach-of-contract claim. *See* TEX. R. CIV. P. 166a(i). Gonzalez's first and second issues are overruled.

### IV. METHODIST'S TRADITIONAL MOTION FOR PARTIAL SUMMARY JUDGMENT

In her third and fourth issues, Gonzalez argues that the trial court erred in granting Methodist's traditional motion for partial summary judgment because Methodist failed to conclusively establish that it is entitled to a qualified privilege with regard to her defamation claim and because Methodist's communications about her to GroupOne were made with actual malice. Methodist counters that the trial court properly granted summary judgment in its favor because it established that GroupOne shared a corresponding interest or duty; the communications made to GroupOne were not made maliciously; and the communications were qualifiedly privileged.

### A. Defamation and Qualified Privilege

For a private individual to sustain a defamation claim, the plaintiff must prove that: (1) the defendant published a false statement about the plaintiff; (2) the statement was defamatory concerning the plaintiff; and (3) the defendant acted with either actual malice, if the plaintiff was a public official or public figure, or negligence, if the plaintiff was a private individual, regarding the truth of the statement. *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998). However, a qualified privilege to make a statement exists when "'the person making the statement . . . makes it in good faith on a subject matter in which the speaker has a common interest with the other person, or with reference to which the speaker has a duty to communicate to the other.'" *Saudi v. Brieven*, 176 S.W.3d 108, 118 (Tex. App.—Houston [1st Dist.] 2004, pet denied) (quoting

*Grant v. Stop-N-Go Mkt. of Tex., Inc.*, 994 S.W.2d 867, 874 (Tex. App.—Houston [1st Dist.] 1999, no pet.)). This privilege does not apply if the information is furnished to others that do not share the common interest. *Id.*; *see Dun & Bradstreet, Inc. v. O'Neil*, 456 S.W.2d 896, 898-99 (Tex. 1970).

"The privilege is also defeated if the defendant makes the statement with actual malice." *Saudi*, 176 S.W.3d at 118 (citing *Grant*, 994 S.W.2d at 874). "'The privilege is abused if the statement is made with actual malice—that is, it is made with knowledge of its falsity or with reckless disregard as to its truth.'" *Id.* (quoting *Grant*, 994 S.W.2d at 874); *see Freedom Newspapers of Tex. v. Cantu*, 168 S.W.3d 847, 858 (Tex. 2005) (stating that "hatred, spite, ill will, or desire to injure" is not proof of actual malice). "Malice . . . cannot be inferred from falsity of the statement alone." *Martin v. Sw. Elec. Power Co.*, 860 S.W.2d 197, 200 (Tex. App.—Texarkana 1993, writ denied). "An uncontroverted affidavit by the person publishing the statement that indicates the statement was not made with actual malice is sufficient to meet the burden to negate actual malice as a matter of law." *Associated Press v. Cook*, 17 S.W.3d 447, 458 (Tex. App.—Houston [1st Dist.] 2000, no pet.); *see Mitre v. La Plaza Mall*, 857 S.W.2d 752, 754 (Tex. App.—Corpus Christi 1993, writ denied).

Essentially, qualified privilege is an affirmative defense in which Methodist bore the burden of conclusively establishing each element of the privilege to prevail on its summary-judgment motion with respect to Gonzalez's defamation claim. *See Bryant v. Lucent Techs., Inc.*, 175 S.W.3d 845, 852 (Tex. App.—Waco 2005, pet. denied). To establish the affirmative defense of qualified privilege, Methodist must show that the

alleged defamatory statement: (1) was made without malice; (2) concerned a subject matter of sufficient interest to the author or was in reference to a duty owed by the author; and (3) was communicated to another party with a corresponding interest or duty. *See id.* (citing *Saudi*, 176 S.W.3d at 118; *Austin v. Inet Techs., Inc.*, 118 S.W.3d 491, 496 (Tex. App.—Dallas 2003, no pet.); *San Antonio Credit Union v. O'Connor*, 115 S.W.3d 82, 99 (Tex. App.—San Antonio 2003, pet. denied)).

In determining whether the standard for actual malice in a defamation action has been satisfied, "the reviewing court must consider the factual record in full." *Bentley v. Bunton*, 94 S.W.3d 561, 591 (Tex. 2002). "[T]he boundaries of actual malice, and particularly reckless disregard, cannot be fixed by the defining words alone but must be determined by the applications of those words to particular circumstances." *Id.* at 592. In other words, actual malice can be proven through circumstantial evidence. *Id.* at 591.

B. Discussion

Methodist attached numerous items to its traditional-summary-judgment motion. Among the items attached were affidavits from Holmgren, Humphreys, and Frazier-White; deposition testimony from Gonzalez; and various forms and emails. Gonzalez filed responses to both of Methodist's summary-judgment motions. In one response, Gonzalez tendered the deposition of Eric Scott, a Vice-President of GroupOne. In his deposition, Scott described GroupOne's business as such: "General services, we are a full-service background screening provider. So we—we do verifications on employment, verifications on education. We do licensure certification for licensed professionals. We do county crim [sic], county criminal research, state[-

]wide research, criminal research. We do bankruptcy. We do motor vehicle." Scott later explained that GroupOne's clientele were "[h]ealth[-]care industries." As stated earlier, Frazier-White noted in her affidavit that:

> Methodist routinely supplies GroupOne Services with employee termination information and also accesses GroupOne Services' information bank for information when hiring prospective employees. This system exists to allow us to ascertain reference information as well as criminal background information on prospective employees and to provide information concerning Methodist termination decisions for the benefit of other hospitals that subscribe to GroupOne Services. Only subscribing hospitals can obtain this information through a public request. Communications concerning termination decisions that are reported to and obtained from GroupOne [S]ervices serve the interests of Methodist and other subscribing hospitals in ensuring that new hires are qualified and suited for their prospective positions and will not constitute a danger to patients and others.

Frazier-White further noted that the electronic reporting of Gonzalez's termination to GroupOne is the procedure normally followed when Methodist employees are terminated and that:

> The information provided to GroupOne Services contains the correct information and the correct termination code verbiage for termination code 7I. I believed the reason for termination concerning Ms. Gonzalez to be accurate at the time the report was sent to GroupOne Services. The report to GroupOne Services is based on information that I believe to be true. I was not motivated by any malice or personal ill will against Ms. Gonzalez, and I know of no malice against her on the part of Methodist Charlton Medical Center or Methodist Hospitals of Dallas.

Likewise, Humphreys, in her affidavit, recounted the circumstances leading to Gonzalez's termination and stated that:

> I made the decision to terminate Merari Gonzalez's employment for violation of Methodist's HIPAA policy; removing patient information from Methodist's property; major misconduct; breach of confidence; and refusing to follow a supervisor's instructions.

. . . .

I was not motivated by any malice or personal ill will against Ms. Gonzalez, and I know of no malice against her on the part of Methodist Charlton Medical Center or Methodist Hospitals of Dallas.

Gonzalez responded to Methodist's summary-judgment motions by filing, among other things, an affidavit from Blend, which noted that:

After Ms. Gonzalez was terminated, the Executive Dean over Health Occupations at El Centro[,] Sondra Fleming and I went to MCMC on behalf of Ms. Gonzalez to meet with who was then the President of MCMC, Zach Chandler. We reiterated to Mr. Chandler the school's polices, including the fact that students are required to obtain patient studies from the hospitals at which they work. We explained why Ms. Gonzalez did not violate HIPAA or breached confidential information and that she should not have been terminated. He dismissed us by simply stating that "her file was closed." When we explained that with Defendant's false statement that she breached confidential information on her record[,] she could not even get a secretarial job and it has ruined her career before she even graduates.[5] I explained that this is not just a little deal, this is a big deal, and that Ms. Gonzalez does not even know if she should continue with the program or drop out now, because MCMC's publication on the GroupOne database would prevent her from getting a job. In response, he dismissively said, "Oh well, there are always jobs for sonographers." I was shocked, in part because, as the president of MCMC, he should know that the majority of sonography students (at El Centro, it is about 90%) get hired by the hospitals that they do rotations in, and at that time, all but two hospitals used the GroupOne database. His comments and conduct during the meeting showed maliciousness and a reckless disregard for the truth of Defendant's statements and the harmful effect the publishing of those statements had on Ms. Gonzalez.

. . . .

I was shocked and absolutely floored by Defendant's conduct toward Ms. Gonzalez, including the publishing of false statements about her. Because of the malicious treatment of Ms. Gonzalez by MCMC, the El

---

[5] We find it worth mentioning that Gonzalez admitted in her affidavit that she is "currently employed at Stork Vision, which is a non-diagnostic sonography clinic and Medical Clinics of North Texas-Arlington, which is a diagnostic clinic."

Centro Sonography Program Faculty decided to terminate our (El Centro Diagnostic Medical Sonography Program's) nearly 25-year relationship with the MCMC sonography department and ended the Radiology Extern program we created with them. Defendant did not conduct itself or treat student employees as an appropriate teaching hospital is expected to do. It violated its duty to aid in the education and training of its student employee. I did not want to expose any more of my students to the kind of malicious treatment Ms. Gonzalez received. The decision to sever the relationship with MCMC was based on Defendant's inappropriate conduct, in particular: making untrue statements that Ms. Gonzalez breached confidential information/violated HIPAA, wrongfully terminating her employment, and showing reckless disregard for the truth and for Ms. Gonzalez's well[-]being by publishing on the GroupOne database that she breached confidential information.

In reviewing the record, we find that the summary-judgment record establishes that GroupOne and Methodist have a shared interest in employee-termination information. Gonzalez contends that "Methodist's publication of the statements on the GroupOne Services database was the equivalent of uploading them onto a nationwide, electronic bulletin board." However, Scott specifically noted in his testimony that GroupOne operates a database for information about prospective employees for health-care providers, and only subscribing members can access this information. *See Saudi*, 176 S.W.3d at 118 (noting that the qualified privilege does not apply if the information is furnished to others that do not share the common interest).

Gonzalez also asserts that the qualified privilege is lost because GroupOne is not one of Gonzalez's prospective employers. Texas courts have held that the qualified privilege also applies to statements made by a former employer to a prospective employer or to a headhunter. *See Free v. Am. Home Assurance Co.*, 902 S.W.2d 51, 55-56 (Tex. App.—Houston [1st Dist.] 1995, no writ) (citing *Pioneer Concrete v. Allen*, 858

S.W.2d 47, 50 (Tex. App.—Houston [14th Dist.] 1993, writ denied)). It appears as if GroupOne's operations are akin to that of a headhunter. According to Scott, prospective health-care employers who subscribe to the service can access the information in determining whether to hire a candidate; essentially, GroupOne serves to match health-care employers with employees through usage of its database. Therefore, with respect to the second and third prongs corresponding to qualified privilege, we conclude that Gonzalez's termination information concerned a subject matter in which the speaker—Methodist—has a common interest—information concerning potential employees in the health-care field—with the other entity— GroupOne. *See Saudi*, 176 S.W.3d at 118; *see also O'Neil*, 456 S.W.2d at 898-99.

Gonzalez also complains that Methodist told another student-employee, Candice Little, about her termination. In her affidavit, Blend identified Little as a Radiology Extern at Methodist who previously attended El Centro and, like Gonzalez, had signed a tuition agreement with Methodist. Gonzalez contends that the alleged publication of the statements to Little destroyed Methodist's asserted qualified privilege. For several reasons, we disagree.

The only evidence Gonzalez directs us to regarding the alleged statements to Little is Blend's affidavit. In her affidavit, Blend explains that: "It is my understanding that Defendant communicated to [sic] its statements about Ms. Gonzalez to Ms. Little, the other student who was employed at MCMC as a Radiology Extern." Though the record does not contain an explicit ruling from the trial court regarding this allegation, Methodist objected to Blend's statement about Methodist's alleged publication of the

information to Little as "not within Blend's personal knowledge and inadmissible hearsay."

A review of Blend's affidavit shows that she did not explain how she learned about the purported publication of the allegedly defamatory information to Little. *See* TEX. R. CIV. P. 166a(f) (providing that summary-judgment affidavits "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to the matters stated therein"). Furthermore, to the extent that one must surmise that Blend learned about the alleged publication from Gonzalez, her recounting of the information in her affidavit would constitute inadmissible hearsay. *See* TEX. R. EVID. 801(d). And finally, even if the statements made by Blend in her affidavit were within her knowledge and not hearsay, it would appear as if the statements purportedly made by Methodist to Little would still be protected, especially considering that Little is an employee of Methodist and, therefore, had a shared interest in the information with Methodist.[6] *See Saudi*, 176 S.W.3d at 118; *Bergman v. Oshman's Sporting Goods, Inc.*, 594 S.W.2d 814, 816 (Tex. Civ. App.—Tyler 1980, no writ); *Butler v. Cent. Bank & Trust Co.*, 458 S.W.2d 510, 514-15 (Tex. Civ. App.—Dallas 1970, writ dism'd w.o.j.); *O'Neil*, 456 S.W.2d at 898-99; *see also Waynick v. County of Dallas*, No. 05-92-01271-CV, 1993 WL 52453, at *6 (Tex. App.— Dallas Feb. 26, 1993, no writ) ("This [qualified] privilege protects statements made by an

---

[6] Based on the summary-judgment record before us, we are unclear about Little's role in this whole matter. To the extent that she may have participated in the investigation of the alleged wrongdoing engaged in by Gonzalez, we note that an employer has a conditional or qualified privilege that attaches to communications made in the course of an investigation following a report of employee wrongdoing. *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995).

employer concerning an employee. All employees have an interest in their employer's termination policies and grounds for termination."). Based on the foregoing, we cannot say that the statements Blend made in her affidavit raise a genuine issue of material fact that Methodist published an allegedly defamatory statement to another person without a corresponding interest or duty. *See Saudi*, 176 S.W.3d at 118.

With respect to the malice prong, both Humphreys and Frazier-White averred in their affidavits that they were not motivated by spite or ill will in terminating Gonzalez. They detailed their motivations for terminating Gonzalez, which were premised upon Gonzalez's removal of the CD with patient information from the premises of Methodist. Both Humphreys and Frazier-White characterized this removal as a serious breach of confidential information, a violation of HIPAA, and a violation of Methodist policies. As described by Frazier-White, Gonzalez's termination was disclosed to GroupOne by way of a Personnel Action Form, which was regularly used by Methodist to document employee actions and for human-resources purposes. In fact, Frazier-White noted that the usage of the Personnel Action Form and the disclosure of employee termination to GroupOne was regularly done by Methodist.

In an attempt to create a material fact issue as to malice, Gonzalez relies heavily on Blend's affidavit, wherein she stated that Methodist's actions in terminating Gonzalez and disclosing the termination to GroupOne was malicious. However, in her affidavit, Blend does not adequately explain how she arrived at her opinion that Methodist's disclosure of Gonzalez's termination to GroupOne was done maliciously. Instead, she just mentions, in a conclusory fashion, that Methodist's actions throughout

the process were malicious. Furthermore, the primary conduct that Blend asserts was malicious was the commentary provided by Chandler, the President of Methodist, at a meeting he had with Blend, whereby he stated, "Oh well, there are always jobs for sonographers" and that Gonzalez's employment file was closed.[7] Blend did not refute the assertions of Humphreys and Frazier-White that the usage of the Personnel Action Form and the disclosure of employee terminations to GroupOne was regularly done. And, Blend failed to demonstrate that Methodist's statements to GroupOne about Gonzalez's termination were made with knowledge of their falsity or with reckless disregard of the truth. Moreover, Gonzalez did not proffer any summary-judgment evidence that creates a material fact issue about the specific instance complained about—that Methodist maliciously disclosed information about her termination to GroupOne.

Based on the foregoing, we conclude that: (1) Methodist, GroupOne, and Little all had a common interest in the information complained about; (2) the record does not demonstrate that Methodist maliciously disclosed Gonzalez's termination information to GroupOne; (3) Methodist established its qualified privilege; and (4) Gonzalez's summary-judgment evidence does not create a material fact issue as to the elements of

---

[7] On appeal, Gonzalez also references Blend's affidavit regarding the grievance hearing held by Methodist regarding her termination. Blend alleged that Methodist prevented her from attending the hearing to assist Gonzalez and from reviewing documents. Gonzalez argues that these allegations indicate a purposeful avoidance of the truth on behalf of Methodist. However, we fail to see how these allegations, if true, constitute more than a scintilla of evidence so as to raise a fact issue regarding the truth of Methodist's reason for terminating Gonzalez and the subsequent disclosure of that reason to GroupOne. Instead, Blend's allegations "'do no more than create a mere surmise or suspicion of fact.'" *Ortega v. City Nat'l Bank*, 97 S.W.3d 765, 772 (Tex. App.—Corpus Christi 2003, no pet.) (op. on reh'g) (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)). As such, we cannot say that Blend's allegations regarding the grievance hearing created a material fact issue so as to preclude summary judgment. *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004).

Methodist's qualified privilege. *See Saudi*, 176 S.W.3d at 118; *Bryant*, 175 S.W.3d at 852; *O'Neil*, 456 S.W.2d at 898-99. As such, we conclude that Methodist was entitled to summary judgment as a matter of law as to Gonzalez's defamation claim. *See* TEX. R. CIV. P. 166a(c); *Grant*, 73 S.W.3d at 215; *see also Saudi*, 176 S.W.3d at 118; *Bryant*, 175 S.W.3d at 852. And, we cannot say that the trial court erred in granting Methodist's traditional motion for partial summary judgment. We overrule Gonzalez's third and fourth issues.

## V.    CONCLUSION

Having overruled all of Gonzalez's issues on appeal, we affirm the judgment of the trial court.


AL SCOGGINS
Justice


Before Chief Justice Gray,
        Justice Davis, and
        Justice Scoggins
Affirmed
Opinion delivered and filed December 7, 2011
[CV06]